IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                  No. CR 10-2737 JB

HERBERT HARWOOD,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendant's: (i) Objections to Restitution, filed August 24, 2011 (Doc. 29)("First Objections"); and (ii) Objections to the Request for Restitution and Memorandum in Support, filed November 1, 2011 (Doc. 35)("Second Objections"). The Court held an evidentiary hearing on October 18, 2011. The primary issue is whether the Court should order Defendant Herbert Harwood to pay restitution for the Navajo healing services that medicine man Joe James provided or for the Geico Insurance Company settlement paid to the deceased victim's estate, and, if so, how much the Court should order Harwood to pay. The Court will sustain the objections. The Court determines that, because Harwood did not commit a crime of violence, the Victim and Witness Protection Act of 1982, 18 U.S.C. § 3663 ("VWPA"), rather than the Mandatory Victim's Restitution Act, 18 U.S.C. § 3663A ("MVRA"), applies to this case. The Court will not exercise its discretion to award restitution for expenses related to James' services, because the United States has not met its burden of establishing that those expenses are compensable under the VWPA. Additionally, the Court will not exercise its discretion to award restitution for expenses related to the $25,000.00 Geico insurance settlement because the United States has not met its burden of establishing that those expenses are recoverable under the VWPA. The Court will

order Harwood to pay $6,340.00 in restitution.  The Court will order that Harwood should pay $840.00 to Karen Pete, the representative of King's estate, before paying the remaining $5,500.00 to the Crime Victims Reparation Commission.

## FACTUAL BACKGROUND

On March 16, 2007, at approximately 4:33 p.m. the Navajo Nation Police and a Criminal Investigator[1] were dispatched to a motor vehicle collision on Navajo Route 36, at mile post 25, in Upper Fruitland, New Mexico.  See Presentence Investigation Report ¶ 6, at 3 (disclosed May 9, 2011)("PSR").  A three-car collision with one fatality was reported.  See PSR ¶ 6, at 3.  The suspect vehicle was described as a white one-ton Dodge Dually truck; it was the tail vehicle.  See PSR ¶ 7, at 3.  The second vehicle was a green Chevrolet Blazer; it was the middle vehicle.  See PSR ¶ 7, at 3.  The third vehicle was a black Mercury Mountaineer; it was the lead vehicle.  See PSR ¶ 7, at 3. Three people occupied the Dually; they were identified as: (i) Harwood; (ii) Harold Johnson, Jr., age 17; and (iii) Peter Chiquito, age 21.  See PSR ¶ 8, at 3.  Johnson and Chiquito fled the scene of the accident, and it was not initially clear who was driving the Dually.  See PSR ¶ 8, at 3.  Corena Peshlaki, Miranda M. Upshaw, Neilson Upshaw, Victoria Fuentes, and Richard King, Jr. occupied the Blazer.  See PSR ¶ 8, at 3.  Melvin and Marita Begaye were in the Mountaineer.  See PSR ¶ 8, at 3.

Witnesses reported that the Dually was traveling at a high rate of speed and crashed into the back of the Blazer.  See PSR ¶ 9, at 3.  The Dually pushed the Blazer into the Mountaineer before the driver lost control and went off the highway.  See PSR ¶ 9, at 3.  King was seated in the Blazer's rear passenger and was killed upon impact.  See PSR ¶ 9, at 3.  The Office of Medical Investigations

---

[1]The Presentence Investigation Report (disclosed May 9, 2011), did not identify the name of the Criminal Investigator.

determined that King's cause of death was craniocerebral injuries as the result of the March 16th automobile accident.  See PSR ¶ 13, at 4.  The other four Blazer occupants were transported to the hospital with the following injuries: (i) Fuentes reported pain, but had no noted injuries; (ii) N. Upshaw received a laceration to the head and a possible nasal fracture; (iii) Peshlaki experienced neck and back pain; and (iv) M. Upshaw was not injured.  See PSR ¶¶ 9-10, at 3-4.  Witnesses observed two individuals, later identified as Johnson and Chiquito, exiting the Dually and fleeing the accident scene.  See PSR ¶ 12, at 4.  Harwood was arrested at the scene and charged with public intoxication.  See PSR ¶ 12, at 4.  He was released from custody the same day and asserted that he was not the Dually's driver.  See PSR ¶ 12, at 4.  No blood alcohol test was administered.  See PSR ¶ 12, at 4.

During the accident investigation, officers discovered empty liquor bottles in the Dually's cabin area.  See PSR ¶ 14, at 4.  The Blazer did not contain any alcohol.  See PSR ¶ 14, at 4.  Officers obtained receipts for liquor purchases that Chiquito made on March 16, 2007, at 3:55 p.m. and 4:04 p.m.  See PSR ¶ 14, at 4.

On March 17, 2007, a Criminal Investigator from the Navajo Nation interviewed Harwood, and Harwood again denied driving the Dually at the time of the accident.  See PSR ¶ 15, at 4.  Harwood asserted that he picked up a hitchhiker, Johnson, as he was traveling out of Farmington, New Mexico.  See PSR ¶ 15, at 4.  Johnson wanted to go into Farmington to buy some beer, and, although Harwood stated he was reluctant, Harwood took Johnson to purchase beer.  See PSR ¶ 15, at 4.  Harwood informed the Criminal Investigator that, after Johnson purchased and consumed the beer, they drove to Upper Fruitland.  See PSR ¶ 16, at 5.  Harwood denied drinking any beer while driving and asserted that he told Johnson to exit the vehicle, but Johnson refused.  See PSR ¶ 16, at 5.  Harwood drove to the Navajo Tribal Utility Authority to pay a bill around 1:20 p.m., while

Johnson waited in the truck.  See PSR ¶ 16, at 5.  After paying the bill, Harwood and Johnson drove around Upper Fruitland.  See PSR ¶ 16, at 5.  While driving, Harwood and Johnson encountered Johnson's friend, Chiquito.  See PSR ¶ 17, at 5.  Harwood stated that he tried to tell Johnson and Chiquito that he needed to go home, but they refused to exit his vehicle.  See PSR ¶ 17, at 5. Harwood drove them to his father's farm in Upper Fruitland, where they parked, and Harwood admitted to drinking two beers.  See PSR ¶ 17, at 5.  Harwood told the Criminal Investigator that Johnson and Chiquito wanted to be dropped off, but that he refused to drive, because he had been drinking.  See PSR ¶ 18, at 5.  Chiquito then offered to drive; Harwood stated that he was in the back seat behind Johnson, who was in the passenger seat.  See PSR ¶ 18, at 5.  Harwood recalled telling Chiquito not to speed, but never saw the vehicle in front of him.  See PSR ¶ 18, at 5.  Harwood remembered that, when Johnson opened the door after the accident, he exited the vehicle and saw a woman on the ground.  See PSR ¶ 19, at 5.  He stated that he ran to help the woman, and saw Johnson and Chiquito running away from the scene.  See PSR ¶ 19, at 5.  Harwood indicated that the Dually belonged to him and that he had purchased it from his brother two weeks before the accident, although they had not yet changed the names on the title.  See PSR ¶ 20, at 5.

On March 21, 2007, the Criminal Investigator interviewed Johnson.  See PSR ¶ 21, at 5. Johnson stated that Harwood picked him up on the side of the road leading out of Farmington.  See PSR ¶ 21, at 5.  Johnson said that Harwood offered him a beer when he entered the Dually and that he saw a six-pack and a forty-ounce beer on the truck's floor.  See PSR ¶ 21, at 5.  Johnson stated that he and Harwood drove around drinking beer, and recalled that Harwood said he had nothing better to do because he had the day off.  See PSR ¶ 21, at 5.  Johnson recalled picking his friend Chiquito up later in the afternoon.  See PSR ¶ 21, at 5.  Johnson stated that they then purchased more liquor in Farmington and continued drinking.  See PSR ¶ 21, at 6.  Johnson did not remember what

-4-

happened before or during the crash.  See PSR ¶ 21, at 6.  He recalled an unknown female waking him up and then jumping out of the passenger window of the truck.  See PSR ¶ 21, at 6.  Johnson stated that Harwood was the only one who drove the Dually that day.  See PSR ¶ 21, at 6.

On March 22, 2007, the Criminal Investigator interviewed Chiquito.  See PSR ¶ 22, at 6.  Chiquito recalled that, when Harwood and Johnson picked him up, they were both "really" intoxicated, with noticeably slurred speech and glossy eyes.  PSR ¶ 22, at 6.  Chiquito stated that he got into the vehicle and drove to the liquor store.  See PSR ¶ 22, at 6.  Chiquito purchased a six-pack of Corona lite beer and a three-quart bottle of Smirnoff vodka at a convenience store, but because Harwood wanted regular Corona, they bought another six-pack.  See PSR ¶ 22, at 6.  Chiquito recalled that Harwood was taking him home and that Harwood was intoxicated.  See PSR ¶ 22, at 6.  Chiquito stated that, at one point, Harwood was driving on the wrong side of the road and that, as they drove along Navajo Route 36, the car crashed.  See PSR ¶ 23, at 6.  Chiquito stated that, when he saw Johnson running, he followed.  See PSR ¶ 23, at 6.

On March 22, 2007, the Criminal Investigator interviewed a witness, Jonathan Ray Smith, who recalled that Johnson and another man, later identified as Harwood, came to his home on March 16, 2007.  See PSR ¶ 24, at 6.  He recalled that Harwood was driving and Johnson was the passenger.  See PSR ¶ 24, at 6.  Smith stated that he did not go with Harwood and Johnson, because they were "pretty" intoxicated.  PSR ¶ 24, at 6.

**PROCEDURAL BACKGROUND**

On September 29, 2010, a federal grand jury indicted Harwood for involuntary manslaughter under 18 U.S.C. §§ 1153 and 1112.  See Indictment, filed September 29, 2010 (Doc. 1).  On March 11, 2011, Harwood entered into a plea agreement and pled guilty to the Indictment.  See Plea Agreement ¶ 3, at 2 (Doc. 21).  The Indictment charges:

On or about March 16, 2007, in San Juan County, in Indian Country, in the District of New Mexico, the defendant, **HERBERT HARWOOD**, an Indian, unlawfully killed Richard King, while in the commission of an unlawful act not amounting to a felony, that is while operating a motor vehicle while under the influence of alcohol, contrary to N.M. Stat. Ann. § 66-8-102 (1978) and recklessly driving contrary to N.M. Stat. Ann. § 66-8-113 (1978), the defendant operated a motor vehicle without due caution and circumspection and with a <u>wanton and reckless</u> disregard for human life, and knew or should have know that his conduct imperiled the lives of others.

Indictment at 1 (emphasis added). In the Plea Agreement, the "parties agree that, as part of the Defendant's sentence, the Court will enter an order of restitution pursuant to the Mandatory Victim's Restitution Act, 18 U.S.C. § 3663A." Plea Agreement ¶ 6, at 3. Harwood admitted that he acted "without due caution and circumspection and with a wanton and reckless disregard for human life" when he entrusted his motor vehicle to an intoxicated person, which he knew "imperiled the lives of others." Plea Agreement ¶ 8, at 3. The parties stipulated that a sentence at the low end of the applicable guideline range is appropriate. <u>See</u> Plea Agreement ¶ 10(b), at 4. Harwood agreed that he would not seek any departure or variance from the applicable guideline range. <u>See</u> Plea Agreement ¶ 10(e), at 5-6.

On May 9, 2011, the United States Probation Office ("USPO") disclosed a PSR for Harwood. The PSR states that the MVRA is applicable to this case. <u>See</u> PSR ¶ 29, at 7. The PSR indicates that King had eight siblings and two children. <u>See</u> PSR ¶ 30, at 7. At the time the PSR was written, King's older sister, Karen Pete, indicated that she would need more time to obtain the appropriate records for any restitution request. <u>See</u> PSR ¶ 34, at 8. The USPO subsequently disclosed the Addendum to the Presentence Investigation Report on June 6, 2011 ("First Addendum"). The First Addendum indicates that, on May 6, 2011, Pete prepared a Victim Impact and Restitution Stated and Financial Impact Statement. <u>See</u> First Addendum at 1. On May 17, 2011, she provided receipts and verification related to her estimated loss. <u>See</u> First Addendum at

1.  Pete reported that she is the family representative for the victim, and that she and her siblings paid for most funeral costs and losses related to King's death.  See First Addendum at 1.  The First Addendum indicates that $6,340.00 was paid to the Desert View Funeral Home in Shiprock, New Mexico and to Greenland Cemetery in Farmington for funeral and burial expenses.  See First Addendum at 2.  Other verified expenses included $4,860.00 for the services of Joe James, a Navajo Medicine Man/Healer, and $150.00 for the services of Jimmy Azzie, who performed a Navajo Healing.  See First Addendum at 2.  The First Addendum indicates that the family received: (i) $1,502.06 in donations from family and friends; (ii) $5,500.00 in compensation from the Crime Victims Reparation Commission;[2] and (iii) $25,000.00 from a wrongful death settlement from Geico Insurance Company.  See First Addendum at 3.  The PSR calculates that Harwood owes: (i) $4,347.50 to Pete; (ii) $5,500.00 to the Crime Victims Reparation Commission; and (iii) $25,000.00 to Geico Insurance.  See First Addendum at 4.  The First Addendum also includes receipts documenting the expenses for which Pete seeks restitution.  James sent Pete a letter documenting that he provided "Counseling Services, Native Healing, Navajo Sacred Tobacco Healing, Sweat Lodge Services, and Salvation."  Letter from Joe James (dated May 6, 2011)(First Addendum at 15)("James Letter").  Azzie also sent Pete a letter documenting the services he provided, a "Native Healing Ceremony for Salvation due to losing a family member in 2007."  Letter from Jimmy Azzie (dated May 6, 2011)(First Addendum at 16)("Azzie Letter").

On August 24, 2011, Harwood filed his First Objections.  See Doc. 29.  Plaintiff United

---

[2]The Crime Victims Reparation Commission was formed in 1981 under the Crime Victims Reparation Act, N.M.S.A. 1978, §§ 31-22-1 to 31-22-24, assist victims of violent crime with expenses incurred as a result of their victimization.  See New Mexico Crime Victims Reparation Commission, CVRC Application (Compensation), available at http://www.cvrc.state.nm.us/brochure/broc1.html.

States of America did not file a written response to Harwood's First Objections.  Harwood represents that the parties have not been able to resolve the restitution amount and that he does not have the necessary documents to determine the appropriate restitution amount.  See First Objections ¶ 1, at 1.  Harwood objects to the $34,847.94 restitution amount that the USPO calculated, because he is concerned that it "includes double payments, excessive or fraudulent billing, and seeks recovery for damages outside of what is allowable under the federal restitution statutes."  First Objections ¶ 2, at 1-2.  Harwood states that the burden is on the United States "to justify every penny of restitution claimed and ordered by the Court."  First Objections ¶ 3, at 2.  Harwood asserts that it is difficult to determine on what some funds claimed in the restitution calculation were spent.  See First Objections ¶ 4, at 2.  Harwood argues that the Crime Victim's Reparation Commission's award of $5,500.00 would be an appropriate amount of restitution if it went to funeral expenses.  See First Objections ¶ 4, at 2.  Harwood asserts that the more than $5,000.00 that the family is seeking for "Navajo healing ceremonies" is excessive, and "not an ordinary and reasonable expense for a funeral."  First Objections ¶ 4, at 2.  Harwood contends that no billing receipts explain these charges or what the billing rate was.  See First Objections ¶ 4, at 2.  He further asserts that "such an excessive claim for religious ceremonies" violates the First Amendment to the United States Constitution's guarantee of separation of church and state.  First Objections ¶ 4, at 2.

Harwood notes that the Navajo Nation routinely pays several thousand dollars towards funeral expenses for its members and that he is concerned that the $6,340.00 in restitution for funeral expenses would mean that the family would receive double payment.  See First Objections ¶ 5, at 2-3.  He states that he "might agree to the $6,324.00 if that included the [Crime Victims Reparation Commission] compensation," but he believes that "the Navajo Nation ha[s] also contributed to the funeral expenses or is willing to do so."  First Objections ¶ 5, at 3.  Harwood also expresses concern

that there is double counting, because it "would seem funeral expenses are a reasonable and ordinary expense of the decedent's estate" and Geico Insurance paid $25,000.00 to King's estate.  First Objections ¶ 5, at 3.  Harwood "specifically objects to the claim of $25,000.00 concerning the Geico settlement," because it is the United States' burden to show that such a claim is appropriate, and it appears that a significant amount of the funds are unclaimed.  First Objections ¶ 6, at 3.  Harwood also objects to including the Geico Insurance settlement, because the settlement of King's estate includes $9,037.25 in attorneys' fees which are outside the scope of the federal restitution statutes.  See First Objections ¶ 7, at 3.  He further asserts that there is no showing that the remaining amount of the settlement is going towards appropriate expenses.  See First Objections ¶ 7, at 4.  He argues that the settlement award also includes other barred expenses, such as pain and suffering, and loss of consortium or other emotional support.  See First Objections ¶ 7, at 4.

On August 29, 2011, the USPO disclosed a Second Addendum to the Presentence Investigation Report ("Second Addendum").  The Second Addendum notes that Harwood objects to the PSR, because he is concerned that the USPO's restitution calculation includes double payments, excessive or fraudulent billing, and seeks recovery for damages outside what is allowable under the federal restitution statutes.  See Second Addendum at 1.  The USPO maintains that the restitution calculation set forth in the First Addendum is correct and appropriate.  See Second Addendum at 1.  The USPO recommends that any disputed facts be resolved at an evidentiary hearing.  See Second Addendum at 1.

On October 18, 2011, the Court held an evidentiary hearing.  The United States represented that Pete was present in the courtroom and would testify regarding the objections to the restitution for the Navajo healing ceremonies.  See Transcript of Hearing at 3:23-4:3 (October 18,

-9-

2011)(Nayback)("Tr.").[3]  The United States asserted that Pete would add to the detailed statement

regarding restitution in the First Addendum.  See Tr. at 4:3-5 (Nayback).  Harwood asserted that,

before Pete took the stand, there was an evidentiary and legal matter he wished to address.  See Tr.

at 4:8-12 (Butcher).  Harwood stated that he strongly disagreed that the First Addendum contained

a detailed statement of the restitution claims.  See Tr. at 4:14-15 (Butcher).  Harwood noted that the

only receipt for the Navajo healing ceremonies was a "to whom it may concern" typed page, without

a signature or letterhead.  Tr. at 4:15-17 (Butcher).  Harwood stated that he had been unable to find

James and that he objected to Pete testifying about the letter when the defense had no opportunity

to speak to the author to verify that information.  See Tr. at 4:21-24 (Butcher).  The Court clarified

that Harwood objected to the May 6, 2011, letter which purported to be a receipt for the $4,860.00

spent on a Navajo healing ceremony.  See Tr. at 5:1-10 (Court, Butcher).  Harwood agreed that he

objected to that document.  See Tr. at 5:3 (Butcher).  Harwood stated that he had made repeated

requests to the USPO and to the United States for additional information concerning those expenses,

but that no further documentation has been provided.  See Tr. at 5:11-13 (Butcher).  Harwood argued

that he was not sure under what theory the $4,860.00 was appropriate restitution.  See Tr. at 5:14-17

(Court, Butcher).  He contended that he does not believe that the cost of James' Navajo healing

ceremony would be an appropriate funeral expense under 18 U.S.C. § 3663A(b)(3).  See Tr. at 5:18-

23 (Butcher).  Harwood asserted that the healing ceremony would not be a necessary funeral

expense, because the fees appeared to be charged for counseling rather than a funeral.  See Tr. at

5:24-6:2 (Butcher).  Harwood also noted that there is another requested funeral expense for a Navajo

ceremony for the services of Jimmy Azzie.  See Tr. at 6:2-5 (Butcher).  Harwood argued that there

---

[3]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

is an overlap between the two ceremonies, and that the $4,680.00 would not be a reasonable and necessary funeral expense under § 3663A(b)(3).  See Tr. at 6:5-9 (Butcher).  Furthermore, Harwood asserted that, if these restitution claims are for psychological care or grief counseling, then the defense would be entitled to view James' resume.  See Tr. at 6:18-21 (Butcher).  He contended that Pete testifying to what James' did and how much she paid him would not be sufficient to establish her claim for restitution.  See Tr. at 6:22-7:2 (Butcher).  He stated that he is entitled to know the background of the person performing the ceremony, details about how many hours he worked, and the details of the services he performed.  See Tr. at 7:2-5 (Butcher).

Harwood stated that he would be willing to pay restitution in the amount of $6,340.00 for the funeral expenses and would not seek any offset for the more than $1,500.00 in donations that the family received.  See Tr. at 7:11-16 (Butcher).  Harwood conceded that the $6,340.00 qualifies as reasonable and necessary funeral expenses under the MVRA.  See Tr. at 7:16-19 (Butcher).  Harwood asserted that, if he was forced to litigate the restitution issues, he would argue that he should not have to pay any restitution, because Geico paid $25,000.00 to the estate and the estate would usually be liable for funeral expenses.  See Tr. at 7:20-24 (Butcher).  Harwood argued that restitution for the Geico Insurance money is not appropriate under § 3663A, because Geico Insurance tendered the policy limits without any determination of what the money was for and that a third of that insurance money went towards attorneys' fees.  See Tr. at 7:25-8:5 (Butcher).  Harwood asserted that under his offer of $6,340.00: (i) $5,500.00 would go to the Crime Victim's Reparation Committee; and (ii) the remaining amount would go to Pete.  See Tr. at 8:17-21 (Butcher).

With respect to Pete's testimony, Harwood argued that he did not believe that her testimony would be sufficient to order such restitution, without any background information on James or

Azzie, and without anyway to verify her testimony.  <u>See</u> Tr. at 8:25-9:4 (Butcher).  Harwood asserted that, because the cost of these services is so high, the defense is entitled to at least James' resume and some way to contact him, so that they could evaluate his credentials and see what services were performed.  <u>See</u> Tr. at 9:4-7 (Butcher).  Harwood contended that these services cannot be justified as reasonably necessary funeral expenses and that, if they were related to psychological services, there has been no evidence Pete would be entitled to recover for them.  <u>See</u> Tr. at 9:7-12 (Butcher).

The United States asserted that its interest is to ensure that Pete is fully compensated for her out-of-pocket expenses.  <u>See</u> Tr. at 9:17-24 (Nayback).  The United States represented that Harwood's attorney, Assistant Federal Public Defender John V. Butcher, had asked for additional itemization of the expenses.  <u>See</u> Tr. at 9:25-10:2 (Nayback).  The United States asserted that Pete could testify to traditional Navajo healing ceremonies.  <u>See</u> Tr. at 10:2-5 (Nayback).  It stated that it did not believe that Harwood had asked for an address or telephone number for the healer, but that it might be able to get that information from Pete.  <u>See</u> Tr. at 10:6-8 (Nayback).  The United States asserted that it was not able to provide Harwood with a further itemization of the expenses.  <u>See</u> Tr. at 10:8-10 (Nayback).  It stated that it would have Pete testify, not to the contents of the letter, but that she paid for these healing services.  <u>See</u> Tr. at 10:11-15 (Nayback).  The United States argued that the restitution for the Navajo healing services would qualify under 18 U.S.C. § 3663A as a cost of necessary funeral and related services, because they were directly related to the death of her brother.  <u>See</u> Tr. at 10:16-19 (Nayback).  The United States contended that King's death left Pete psychologically distraught, and that a funeral service is akin to a healing ceremony in that both bring closure and would fit under the statutory language of "related services."  Tr. at 10:21-11:1 (Nayback).  The United States asserted that it could not find any case law on point and that this

might be a case of first impression for the Court. See Tr. at 11:2-6 (Nayback).

Responding to Harwood's First Objections, the United States argued that his argument before the Court seemed different from the objections filed earlier. See Tr. at 11:7-8 (Nayback). The United States asserted that, in his First Objections, Harwood accuses the family of engaging in fraud and double-dipping, and asserts that the Navajo Nation routinely pays for funeral expenses. See Tr. at 11:7-12 (Nayback). The United States represented that, although the Navajo Nation has such a program, the program is limited and has certain financial cut-offs. See Tr. at 11:13-16 (Nayback). The United States asserted that Pete does not qualify for the assistance program, because she is gainfully employed and makes over $10,000.00 a year. See Tr. at 11:16-20 (Nayback). The United States represented that Pete kept detailed records about donations from other members of the community and that they were appropriately deducted from the total restitution amount. See Tr. at 11:21-12:1 (Nayback). It argued that both healing ceremonies were necessary funeral and related expenses, that there is no fraud, and that this service is not one where the Court would need to see a resume. See Tr. at 12:2-8 (Nayback). The United States noted that Harwood's restitution offer would leave Pete "short-changed," depending on who got paid first. Tr. at 12:9-12 (Nayback). It asserted that the United States' goal was to see Pete compensated. See Tr. at 12:12-14 (Nayback). Finally, the United States represented that insurance companies are entitled to restitution in the event that they have to pay for a wrongful death. See Tr. at 12:15-18 (Nayback). The United States asserted that the insurance settlement did not go to Pete, but is being held in trust for King's two children. See Tr. at 12:18-21 (Nayback). It conceded that any portion of the settlement that went towards attorneys' fees is not compensable and that the Court should not order Harwood to pay that portion of the Geico Insurance settlement. See Tr. at 12:22-13:1 (Nayback). The United States asserted that Harwood had other written objections that he did not orally raise

-13-

before the Court and that it was responding to his oral objections.  See Tr. at 13:2-3 (Nayback).

The Court stated that its research indicated that testimony is often given when a family member seeks restitution for religious services.  See Tr. at 13:15-16 (Court).  The Court noted that it was looking at United States v. Iron Cloud, 312 F.3d 379 (8th Cir. 2002), where the victim's father testified regarding the religious services, and United States v. Sayetsitty, 176 F.3d 486, 1999 WL 197246 (9th Cir. 1999)(unpublished table decision), where there was some testimony about what a traditional Navajo burial ceremony includes.  See Tr. at 13:16-14:2 (Court).  The Court also noted that, in United States v. Bedonie, 317 F.Supp.2d 1285 (D. Utah 2004), the United States District Court for the District of Utah also permitted testimony and relied heavily upon it.  See Tr. at 14:3-6 (Court).  The Court stated that, given the actions of other federal courts, it would like to hear Pete's testimony.  See Tr. at 14:6-7 (Court).  The Court noted that, in all of the cases it had found, federal courts awarded restitution for a Native American medicine man or healer.  See Tr. at 14:12-22 (Court).

Harwood agreed that some of the fees that the United States sought were appropriate and that he did not challenge Azzie's fee.  See Tr. at 14:23-25 (Butcher).  Harwood stated that the Navajo equivalent of a preacher performing a service would be compensable.  See Tr. at 15:1-2 (Butcher).  Harwood asserted that his complaint is that the receipt for the services has no letterhead and is not signed.  See Tr. at 15:3-7 (Butcher).  Harwood asserted that, the more costly the expense, the more information is needed to justify it.  See Tr. at 15:14-18 (Butcher).  Harwood argued that he is entitled to a basis for cross-examination and that, without James' background, he has no ability to investigate or effectively cross-examine on this issue.  See Tr. at 15:18-23 (Butcher).  He contended that, of course, the MVRA covers some traditional healing ceremonies, but that reasonable expenses would be more similar to the $150.00 ceremony than the $5,000.00 healing ceremony.  See Tr. at

15:14-16:4 (Butcher).  He suggested that such a large fee is more than what is necessary for the healing ceremony or the burial itself, and that, because it is such a large fee, he is entitled to more information.  See Tr. at 16:5-7 (Butcher).  Harwood argued that, if the claim is for grief counseling or psychological services, then he has even greater need of more information.  See Tr. at 16:7-9 (Butcher).  The Court stated that perhaps Pete could provide that kind of information.  See Tr. at 16:10-12 (Court).

The United States then called Pete to the witness stand.  See Tr. at 16:13-14 (Nayback).  After being sworn in, Pete testified that she is from Hogback, New Mexico on the Navajo Nation Indian Reservation.  See Tr. at 17:8-11 (Nayback, Pete).  She testified that King was her younger brother and that she was responsible for putting together his funeral.  See Tr. at 17:19-24 (Nayback, Pete).  Pete stated that she used her savings and borrowed money to pay for the funeral.  See Tr. at 18:11-14 (Nayback, Pete).  With respect to donations, Pete testified that her family and friends also contributed to the funeral, and that, to the best of her ability, she kept an itemized list of those donations.  See Tr. at 18:15-22 (Nayback, Pete).  She stated that she provided all the donation records to the USPO.  See Tr. at 19:2-4 (Nayback, Pete).  Pete testified that she paid for two Navajo healing ceremonies.  See Tr. at 19:5-8 (Nayback, Pete).  She explained that the ceremony, which James performed, cost $4,860.00 and the ceremony, which Azzie performed, cost $150.00.  See Tr. at 19:9-16 (Nayback, Pete).  With respect to ceremony Azzie performed, Pete testified that she experienced several dizzy spells which he cured.  See Tr. at 19:20-20:2 (Nayback, Pete).  She stated that the dizzy spells were related to her brother's death, because she started experiencing them in 2007 a few months after her little brother's death.  See Tr. at 20:8-13 (Nayback, Pete).  Pete explained that the ceremony which Azzie performed was a minor one.  See Tr. at 20:24-25 (Pete).

With respect to the ceremony that James performed, Pete testified that James lives in Pinon,

Arizona.  See Tr. at 21:5-9 (Nayback, Pete).  She stated that she paid James $4,860.00.  See Tr. at

21:17-19 (Nayback, Pete).  Pete stated that the healing ceremony was performed on her, because her

body was constantly frozen and that the ceremony lasted five days.  See Tr. at 21:20-24 (Nayback,

Pete).  She stated that the healing was related to her brother's death.  See Tr. at 22:3-5 (Nayback,

Pete).  Pete explained that James informed her he was going to perform a specific ceremony and

worked from her feet to her hair, putting grease all over her body.  See Tr. at 22:13-19 (Pete).  She

stated that after the ceremony she had to keep herself "sacred."  Tr. at 22:19-20 (Pete).  She

explained that she had to avoid negative things and think positively so that her brother could leave

them.  See Tr. at 22:22-23.  Pete stated that, after the ceremony was over, her brother told her to be

strong and to not cry.  See Tr. at 22:23-25 (Pete).  She explained that she felt her body change and

it became warm again.  See Tr. at 23:1-3 (Pete).  She stated that, after the ceremony, she received

a letter from James detailing the ceremony and services he provided.  See Tr. at 23:4-7 (Nayback,

Pete).  Pete represented that, beyond the healing ceremony, she also received counseling from James

and that all of their discussions took place in the Navajo language.  See Tr. at 23:8-24 (Nayback,

Pete).  Pete stated that she saw James approximately eight times.  See Tr. at 24:3-4 (Nayback, Pete).

Pete also explained that she was not eligible for the Navajo Nation program, which helps to pay for

funeral expenses, because her income is too high.  See Tr. at 24:7-23 (Nayback, Pete).

    Before beginning cross-examination, Harwood clarified that he was no longer arguing that

the restitution amount should be reduced by the amount Navajo Nation would compensate Pete for

some of the funeral expenses, because he realizes that Pete will not receive compensation from the

tribe.  See Tr. at 25:19-26:6 (Court, Butcher).  When asked whether the ceremony that Azzie

performed related to King's death, Pete stated that it did not and that the ceremony took place

approximately four months after King's death.  See Tr. at 27:3-9 (Butcher, Pete).  Pete clarified that

-16-

Azzie performed the first ceremony and she later went to James.  See Tr. at 27:10-12 (Butcher, Pete).  Pete stated that no other family members were part of the ceremony with Azzie.  See Tr. at 27:13-16 (Butcher, Pete).  Pete recalled that the ceremony with James took place in 2008, about a year after King's death.  See Tr. at 27:17-22 (Butcher, Pete).  Pete stated that the ceremony was not part of King's funeral services and that she was the only family member who benefitted from James' services.  See Tr. at 27:23-28:3 (Butcher, Pete).  Pete testified that she had a "coldness" in her body, but did not seek traditional medical treatment for her condition.  Tr. at 28:4-13 (Butcher, Pete).  Pete agreed that the ceremonies which James and Azzie performed were not for King, but for her.  See Tr. at 28:19-29:1 (Butcher, Pete).  She testified that she paid for both ceremonies in cash.  See Tr. at 29:9-19 (Butcher, Pete).  She also testified that James wrote a letter documenting the services he provided, rather than a receipt.  See Tr. at 29:21-24 (Butcher, Pete).  Pete agreed that the letter is unsigned, and does not give an address or telephone number for James.  See Tr. at 30:1-4 (Butcher, Pete).  Pete noted that the letter was dated May 6, 2011, approximately three years after he provided the services.  See Tr. at 30:9-15 (Butcher, Pete).  Pete testified that she kept receipts from the donations to her brother's funeral, because it was for King and agreed that the ceremony was not part of King's funeral service.  See Tr. at 31:2-9 (Butcher, Pete).  Pete stated that James is not related to her by blood or clan, and that he is not a friend of her family.  See Tr. at 31:10-16 (Butcher, Pete).  Pete testified that she found James through Azzie, and that Azzie is not related to her through blood or clan.  See Tr. at 31:16-23 (Butcher, Pete).

On re-direct, Pete testified that she had never been the victim of a crime before and did not know why the United States was asking her for her receipts.  See Tr. at 33:6-12 (Nayback, Pete).  Pete stated that she asked James for a letter explaining the services he provided, because the United States asked for a receipt.  See Tr. at 33:13-16 (Nayback, Pete).  Pete explained that the English

-17-

translation of the ceremony James provided is a Healing Salvation Ceremony. <u>See</u> Tr. at 33:24-7 (Nayback, Pete). She testified that the reason she sought the healing from James was her little brother's death. <u>See</u> Tr. at 34:24-35:1 (Nayback, Pete).

With respect to the Geico Insurance payment, the United States asserted that Pete did not file a suit. <u>See</u> Tr. at 35:11-15 (Court, Nayback). The United States represented that King's estranged wife filed a claim on behalf of King's two children and that Geico Insurance compensated her, with the money being held in trust for the children. <u>See</u> Tr. at 35:15-20 (Nayback). The United States conceded that approximately one-third of the Geico Insurance settlement went towards attorney fees. <u>See</u> Tr. at 35:21-23 (Nayback). The United States admitted that Harwood should not be required to pay the portion of the settlement that went towards attorney fees. <u>See</u> Tr. at 36:4-10 (Nayback). The United States noted, however, that Harwood did not cite any legal authority for the proposition that attorney fees are not compensable. <u>See</u> Tr. at 36:11-12 (Nayback). The United States represented that it would argue that the payment was for wrongful death and that how the money was split up after Geico Insurance made the payment is irrelevant. <u>See</u> Tr. at 36:13-16 (Nayback). Harwood responded that the settlement, an amount reflecting the policy limits, was paid to King's estate. <u>See</u> Tr. at 36:23-37:7 (Butcher). Harwood argued that it was not paid for allowable restitution purposes under 18 U.S.C. § 3663A; Geico Insurance simply tendered the policy limits. <u>See</u> Tr. at 36:8-15 (Butcher). Harwood further asserted that, because the estate was paid the $25,000.00, the funeral expenses should have been paid from the estate. <u>See</u> Tr. at 37:16-18 (Butcher). Harwood contended that, because there was never a court determination about for what the settlement was intended to compensate, the United States cannot demonstrate that restitution for the settlement is appropriate under the MVRA. <u>See</u> Tr. at 38:2-6 (Butcher).

Harwood argued that Pete's testimony makes clear that the ceremony James provided was

-18-

not a funeral or related expense, because it was not done for the benefit of King's spirituality or that of the family in general. See Tr. at 38:22-39:1 (Butcher). He contended that the ceremony was done as medical treatment for Pete. See Tr. at 39:1-2 (Butcher). Harwood argued that, under the MVRA, the expense must be the result of his offense conduct for restitution to be appropriate. See Tr. at 39:2-5 (Butcher). The Court stated that § 3663A(b)(2)(A) seems to have a broad definition of services, which includes "the cost of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care." Tr. at 39:12-19 (Court). The Court stated that the provision does not appear to be limited to medical care. See Tr. at 39:20-22 (Court). Harwood admitted that the provision could be read broadly, but stated that there was a more fundamental issue of proximate cause. See Tr. at 39:23-40:1 (Butcher). The Court asked whether Harwood would agree that, if the healing ceremony was performed on King, it would be covered. See Tr. at 40:2-7 (Court). In response, Harwood offered his own hypothetical and stated that, if King's children went to grief counseling and there was a charge, then he would agree that those expenses would be recoverable even though a grief counselor may not be a doctor. See Tr. at 40:14-25 (Butcher). Harwood went on to concede that, if the family met to a medicine man for grief counseling, the MVRA would cover that expense. See Tr. at 41:1-3 (Butcher). The Court asked whether a medicine man treating King, if had not died as suddenly, would be a recoverable expense. See Tr. at 41:6-9 (Court). Harwood stated that he would agree that payment would be appropriate, assuming there was no proximate cause issue and there is a uniform recognition within the Navajo community that it was an appropriate treatment. See Tr. at 41:10-15 (Butcher). The Court stated that Harwood appeared to concede in his hypothetical that the children could be victims and asked whether Pete could also be a victim as a sibling. See Tr. at 41:16-22 (Court). Harwood responded that the Court's question was tricky and that Pete could possibly be a victim. See Tr. at 41:23-42:1

-19-

(Butcher).  Harwood admitted that Pete might be a victim, but argued that the further out the relationship -- such as a fifth cousin or a person who does not have a close, personal relationship -- would not qualify for restitution for psychological services.  See Tr. at 42:1-8 (Butcher).  Harwood explained that part of his concern with this expense is how large it is and stated that he does not have a problem with Pete asserting that, because she lost her brother, she was in need of some spiritual counseling.  See Tr. at 42:13-18 (Butcher).  Harwood stated that, having spoken with other medicine men, the cost of James' healing ceremony seems excessive.  See Tr. at 42:19-23 (Butcher).  He asserted that, if a medicine man had come to the funeral and met with the family for four to five hours, he would not contest that fee.  See Tr. at 42:24-43:3 (Butcher).

Harwood explained that he does not object to restitution for these ceremonies, because they involve a Native American healer.  See Tr. at 43:4-5 (Butcher).  He asserted that his problems with the restitution calculation include that: (i) King's death was not the proximate cause of Pete's injury; (ii) the charges for the ceremony were excessive; and (iii) the ceremony was not for the spirituality of King or of his immediate family, and did not take place at the time of the funeral.  See Tr. at 43:4-11 (Butcher).  Harwood further asserted that, with respect to the proximate cause issue, the United States Court of Appeals for the Second Circuit had recently written an opinion on proximate cause addressing restitution in a child pornography case, but that he could not recall the case name.  See Tr. at 44:10-17 (Butcher).  Harwood represented that the Second Circuit found that a victim of child pornography could not get restitution from a defendant who possessed or trafficked pictures of the child, even though they are victims.  See Tr. at 44:22-45:1 (Butcher).  He argued that, given the length of time between the funeral and the ceremony, there is a lack of proximate cause between King's death and the expenses.  See Tr. at 45:7-14 (Butcher).  He contended that, because the ceremony took place long after the funeral and was only for Pete's benefit, it did not meet the

-20-

proximate cause hurdle. <u>See</u> Tr. at 45:15-20 (Butcher).   Furthermore, he asserted that the expenses are not reasonable and are inconsistent with his own uses of a Navajo medicine man. <u>See</u> Tr. at 45:22-46:3 (Butcher).  Harwood asserted that Pete's complaint appeared to be more of a medical complaint, but that she did not seek medical treatment for it. <u>See</u> Tr. at 46:3-5 (Butcher).  Harwood further asserted that, if the Court were inclined to award this restitution, he would argue that this money should have been paid out of the estate. <u>See</u> Tr. at 46:9-10 (Butcher).

The Court stated that it would take the issue under advisement. <u>See</u> Tr. at 46:12 (Court). The Court also noted that there are cases where counseling expenses are awarded as restitution, pointing to <u>United States v. Fisher</u>, 87 F.App'x 5 (8th Cir. 2004)(unpublished), and <u>United States v. Oslund</u>, 453 F.3d 1048 (8th Cir. 2006). <u>See</u> Tr. at 46:16-47:14 (Court, Butcher).  The Court stated that, in past cases, the Court had put the insurance settlement to the side in terms of calculating the restitution available to the victim, but that it did not believe it had been asked to reimburse an insurance company. <u>See</u> Tr. at 47:23-48:6 (Court).  Harwood requested that Court allow the parties to submit further briefing to the Court on the restitution issue and set a deadline of two weeks from the date of the hearing. <u>See</u> Tr. at 48:17-24 (Butcher).  The United States asserted that it would not object to such a deadline. <u>See</u> Tr. at 48:25-49:1 (Court, Nayback).  The Court set a deadline two weeks from the date of the hearing. <u>See</u> Tr. at 49:2-5 (Court).

Pete also allocuted before the Court and discussed the healing ceremonies in further detail during her allocution.  Pete stated that King's body was embalmed at the funeral home and that the body was ice cold. <u>See</u> Tr. at 53:8-11 (Pete).  She explained that she was so in shock that she held onto his body, without realizing how cold he was. <u>See</u> Tr. at 53:13-15 (Pete).  Pete stated that she touched her brother's body and that Native Americans are not supposed to do that. <u>See</u> Tr. at 53:16-19 (Pete).  She explained that she wanted her brother to know how much she loved him. <u>See</u> Tr. at

53:19-22 (Pete).  She stated that, after she touched the body, her hands started getting cold, but that, because of the healing ceremony she went through, her hands are now warm.  See Tr. at 54:9-11 (Pete).  Pete stated that, before the ceremony, she was not eating or sleeping right, but that the ceremony healed her.  See Tr. at 58:4-5 (Pete).  She explained that, standing before the Court, her hand was warm and that her body is not frozen any more.  See Tr. at 58:5-8 (Pete).

On November 1, 2011, Harwood filed his Second Objections.  See Doc. 35.  The United States did not file any further briefing.  Harwood maintains his objections to the restitution calculation.  See Second Objections at 1.  He represents that, as a matter of compromise, he would agree to a restitution order of $6,340.00, which would include the $5,500.00 Crime Victim's Reparations Commission check.  See Second Objections at 1.  Harwood asserts that, should the Court find that he should reimburse Geico Insurance for all or part of the $25,000.00 to King's estate, then there was a duty to mitigate the funeral costs with money from the estate to avoid double compensation.  See Second Objections at 1.  Harwood objects to restitution for the Geico Insurance award, and for the healing ceremonies that James and Azzie performed for Pete's benefit.  See Second Objections at 1.  He represents that, after James was identified at the hearing, his investigation revealed that James is not recognized as a medicine man or traditional healer by the Navajo Nation Medicine Man Association.  See Second Objections at 1.

Harwood argues that the MVRA does not apply in this case, because involuntary manslaughter is not a crime of violence.  See Second Objections ¶ 1, at 2.  Harwood asserts that, because the MVRA does not apply, the Court must look to 18 U.S.C. § 3663 to determine the correct amount of restitution.  See Second Objections ¶ 2, at 2.  Harwood contends that, under § 3663, when the victim of the offense is deceased, no restitution should be paid to the estate, but the representative of the victim's estate may assume the victim's rights.  See Second Objections ¶ 2, at

2.  Harwood argues that the Geico Insurance settlement indicates that a person other than Pete has been appointed to represent King's estate.  See Second Objections ¶ 2, at 2.  Harwood contends that, although § 3363 allows for recovery of "the cost of necessary funeral and related expenses," neither general payments to the victim's estate nor psychological service for the victim's family are recoverable.  See Second Objections ¶ 3, at 2-3.

        With respect to restitution for Pete's healing ceremonies, Harwood asserts that such a request lacks a legal or factual basis.  See Second Objections ¶ 6, at 4.  Harwood first argues that the requested expense is not a necessary funeral or related service to King's death and burial.  See Second Objections ¶ 6, at 4.  Harwood further contends that there is a lack of proof justifying the requested expense.  See Second Objections ¶ 6, at 4.  Moreover, Harwood requests an additional evidentiary hearing, because James does not appear to be recognized by or known to the Navajo Nation Medicine Association.  See Second Objections ¶ 6, at 4.  He asserts that these services cannot be considered a recognized method of healing within the Navajo Nation.  See Second Objections ¶ 6, at 4.  Harwood argues that James' charges are not consistent with the usual costs of a "Blacking Ceremony"[4] and represents that one of his relatives performed such a ceremony for $50.00.  Second Objections ¶ 6, at 4.  He asserts that Pete admitted that the healing ceremonies were not done as part of the funeral or for the benefit of King, and occurred approximately a year after the funeral.  See Second Objections ¶ 7, at 4-5.  Harwood admits that, under certain circumstances, a Navajo ceremony may be a necessary funeral or related service when performed by an appropriate medicine man.  See Second Objections ¶ 8, at 5.  Harwood asserts that his own family has used a medicine man for healing services and that the alleged cost of the "blacking" ceremony is excessive.  Second

---

        [4]The Court could not locate a description of what a traditional "Blacking" or "Blackening" ceremony involves or what the purpose of such a ceremony is.

Objections ¶ 8, at 5.

Harwood asserts that, in <u>United States v. Iron Cloud</u>, the United States Court of Appeals for the Eighth Circuit found that a traditional "giveaway" ceremony was a necessary funeral and related expense.  Second Objections ¶ 9, at 5 (citing <u>United States v. Iron Cloud</u>, 312 F.3d at 383). Harwood notes that the Eighth Circuit found that it was customary for surviving family members to perform that ceremony, that another ceremony would be ineffective, and that the defendant did not dispute the cost.  <u>See</u> Second Objections ¶ 9, at 5.  Harwood argues that none of those factors are present in this case, because: (i) the ceremonies were only for Pete's benefit; (ii) they were not done to honor or for the spiritual well-being of King; and (iii) the ceremonies cannot be analogized to "grief counseling."  Second Objections ¶ 10, at 5.  Harwood contends that there is a lack of relationship between Pete's alleged injury and his wrongful conduct.  <u>See</u> Second Objections ¶ 11, at 6.  Harwood asserts that Pete stated that the healing ceremonies were necessary, because she handled and touched King's body.  <u>See</u> Second Objections ¶ 11, at 6.  He argues that her injuries were not the result of King's death and could not be a reasonably foreseeable result of his wrongful actions.  <u>See</u> Second Objections ¶ 11, at 6.  Harwood contends that, for restitution to be owed, more than a mere possibility of injury is required.  <u>See</u> Second Objections ¶ 11, at 6.  Harwood asserts that, even if the claims are not barred as a matter of law, the United States presented insufficient evidence to support restitution for the healing ceremonies.  <u>See</u> Second Objections ¶ 12, at 6. Harwood argues that the sole basis for the $4,860.00 is an unsigned document which did not contain any of James' identifying information.  <u>See</u> Second Objections ¶ 12, at 6. He asserts that the James Letter attached to the First Addendum does not: (i) state what specific ceremonies were performed; (ii) state why those ceremonies were necessary; (iii) demonstrate that James received that money or listed it as income on his taxes; or (iv) appear consistent with Pete's testimony.  <u>See</u> Second

-24-

Objections ¶ 12, at 6-7.  He argues that Pete testified that the counseling services was solely for her benefit, even though the document states it was also for her family, and no other family member met with James.  See Second Objections ¶ 13, at 7.  Harwood argues that, "[d]espite this being the largest claim for restitution, except for the direct funeral expenses, and Ms. [Pete] ke[pt] detailed records even for donations as small as $5.00, no documentation for this claim of over $5,000.00."  Second Objections ¶ 14, at 7.

Harwood represents that, since James was identified as a Navajo medicine man living in "Pinedale, Arizona,"[5] the Navajo Nation Medicine Man Association has indicated that there is no record of him as a medicine man for the Navajo Nation.  Second Objections ¶ 15, at 7.  Harwood argues that, because "no details of Mr. James' history was provided either before or at the hearing and there is no proof of his existence, much less his credentials, there is a lack of evidence to show that Mr. James' ceremonies" are a recognized method of healing.  Second Objections ¶ 15, at 7.  Harwood asserts that fake healers plague the Navajo Nation.  See Second Objections ¶ 15, at 8 (citing Bill Donovan, Fake Healers Plague Navajo Nation, High Country News (October 13, 1997), available at http://www.hcn.org/issues/116/3714).  Harwood requests that the Court hold an additional evidentiary hearing so that a representative from the Navajo Nation Medicine Man Association could testify to the qualifications necessary to perform the ceremony and that the alleged cost of the ceremony are unusual.  See Second Objections ¶ 15, at 8.  Harwood asserts that

---

[5]Although Harwood states that James was identified as living in "Pinedale, Arizona," Second Objections ¶ 14, at 7, the hearing transcript reflects that Pete identified James as living in Pinon, Arizona, see Tr. at 21:5-9 (Nayback, Pete).  Pinedale is an unincorporated community in Navajo County, Arizona.  See Pinedale, Arizona, WIKIPEDIA.ORG, http://en.wikipedia.org/wiki/Pinedale,_Arizona (last visited January 7, 2012).  Pinon is also in Navajo County, Arizona and is within the Navajo Nation.  See Pinon, Arizona, WIKIPEDIA.ORG, http://en.wikipedia.org/wiki/Pinon,_Arizona (last visited January 7, 2012).

he was "barred" from presenting evidence at the last hearing, because James had not been previously identified and there was no statement about what ceremony was performed.  See Second Objections at 8 n.2.

With respect to the Geico Insurance restitution claim, Harwood argues that § 3663 does not allow for reimbursement of insurance paid or attorneys' fees.  See Second Objections ¶ 16, at 8. Harwood asserts that insurance settlements should be used to offset a defendant's restitution. See Second Objections ¶ 16, at 8 (citing 18 U.S.C. § 3664(j)).  Harwood contends that, because he stands in the insured's shoes, Geico Insurance cannot seek restitution from him.  See Second Objections ¶ 17, at 8.  Harwood further argues that Geico Insurance did no more than tender the policy limits to King's estate without any finding regarding for what the money was to be used. See Second Objections ¶ 18, at 8-9.  He asserts that, to the extent the estate would be liable for King's burial expenses, the Geico Insurance payment should offset that expense.  See Second Objections ¶ 18, at 9 (citing 18 U.S.C. § 3664(j)).  Harwood states that he seeks an offset only if he is ordered to reimburse Geico Insurance.  See Second Objections ¶ 18, at 9.  He argues that, ultimately, the settlement funds did not go towards any § 3663 expense, and were "divided between the lawyers and [King's] children."  Second Objections ¶ 19, at 9.  Harwood asserts that awarding restitution for the Geico Insurance settlement would complicate the application of restitution, because, according to the insurance documents, Pete is not the estate's representative and, under § 3663(a)(1)(A), there can only be one estate representative.  See Second Objections ¶ 19, at 9.

Harwood maintains that, if the Court does not order him to pay restitution which includes the settlement or Pete's healing ceremonies, he is willing to pay $6,340.00 in total restitution. See Second Objections ¶ 21, at 10.

## LAW REGARDING RESTITUTION

Courts have no inherent power to order restitution; they may only do so when a statute so authorizes.  See United States v. Gordon, 480 F.3d 1205, 1210 (10th Cir. 2007).  In 1982, Congress enacted the Victim and Witness Protection Act of 1982, 18 U.S.C. § 3663 ("VWPA"), which authorizes district courts to, in their discretion, order restitution for victims of criminal conduct.  See 18 U.S.C. § 3663(a)(1)(A) (stating that a district court "may order" that a defendant make restitution to any victim of an offense or, if the victim is deceased, to the victim's estate).  See also United States v. Quarrell, 310 F.3d 664, 677 (10th Cir. 2002)("Under the VWPA, the court has discretion to order restitution 'when sentencing a defendant convicted under this title . . . other than an offense described in section 3663A(c).").  The VWPA applies when a court sentences

> a defendant convicted of an offense under this title, section 401, 408(a), 409, 416, 420, or 422(a) of the Controlled Substances Act (21 U.S.C. 841, 848(a), 849, 856, 861, 863) (but in no case shall a participant in an offense under such sections be considered a victim of such offense under this section), or section 5124, 46312, 46502, or 46504 of title 49, other than an offense described in section 3663A (c). . .

18 U.S.C. §3663(a)(1)(A).  The VWPA requires that a court consider the defendant's economic circumstances before ordering restitution.  See 18 U.S.C. § 3663(a)(1)(B).

In 1996, Congress enacted the MVRA, which made restitution mandatory in certain cases, "particularly crimes of violence and theft crimes with identifiable victims who 'suffered a physical injury or pecuniary loss.'" United States v. Serawop, 505 F.3d 1112, 1117 (10th Cir. 2007)(citing 18 U.S.C. § 3663A(c)(1)).  The MVRA applies:

> **(c)(1)**  . . . in all sentencing proceedings for convictions for convictions of, or plea agreements relating to charges for, any offense –
>
> **(A)**    that is --
>
> **(i)**    a crime of violence, as defined in section 16;

-27-

> > **(ii)** an offense against property under this title, or under section 416(a) of the Controlled Substances Act (21 U.S.C. 856(a)), including any offense committed by fraud or deceit; or
>
> > **(iii)** an offense described in section 1365 (relating to tampering with consumer products); and
>
> **(B)** in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.
>
> **(2)** In the case of a plea agreement that does not result in a conviction for an offense described in paragraph (1), this section shall apply only if the plea specifically states that an offense listed under such paragraph gave rise to the plea agreement.

18 U.S.C. § 3663A(c)(1) (emphasis original).  Unlike the VWPA, the MVRA does not permit a court to consider a defendant's economic circumstances when it imposes restitution.  See United States v. Serawop, 505 F.3d at 1118 (citing 18 U.S.C. § 3664(f)(1)(A)).

Other than the mandatory nature of restitution under the MVRA and the requirement that a court consider a defendant's economic circumstances under the VWPA, the "'provisions of the VWPA and MVRA are nearly identical in authorizing an award of restitution.'"  United States v. Serawop, 505 F.3d at 1118 (quoting United States v. Randle, 324 F.3d 550, 555-56 & nn.2-3 (7th Cir. 2003).  The term "victim," under both statutes means:

> a person directly and proximately harmed as a result of the commission of an offense as a result of the commission of an offense for which restitution may be ordered . . . . In the case of a victim who is under 18 years of age, incompetent incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section, but in no event shall the defendant be named as such representative or guardian.

18 U.S.C. § 3663A(a)(2); 18 U.S.C. § 3663(a)(2).  Both statutes also state that, where an offense "resulting in bodily injury also results in the death of a victim," a court may order a defendant to "pay an amount equal to the cost of necessary funeral and related services" under the VWPA.  18

-28-

U.S.C. § 3663(b)(3).  Accord 18 U.S.C. § 3663A(b)(3).  Additionally, the VWPA and MVRA provide that, "to the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of any order of restitution outweighs the need to provide restitution to any victims, the court may decline to make such an order."  18 U.S.C. § 3663(a)(1)(B)(ii).  Accord 18 U.S.C. § 3663A(c)(3)(B).  Any dispute "as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence" and the "burden of demonstrating the amount of loss shall be on the attorney for the Government."  18 U.S.C. § 3664(e); United States v. Serawop, 505 F.3d at 1117 (stating that the United States bears the burden of proving amount of loss under the MVRA); United States v. Sundstrom, 221 F.3d 1354, 2000 WL 1005267, at *2 (10th Cir. 2000)(unpublished table decision)(stating that the United States bears the burden of establishing the amount of loss by a preponderance of the evidence under the VWPA).  The burden of demonstrating the defendant's financial resources and the financial needs of the defendant's dependants is on the defendant.  See 18 U.S.C. § 3664(e) ("The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant.").  "The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires."  18 U.S.C. § 3664(e).

Several courts have held that restitution is appropriate for expenses related to Native American healing or traditional ceremonies performed by medicine men.  In United States v. Bedonie, 317 F.Supp.2d 1285 (D. Utah 2004) rev'd on other grounds by United States v. Bedonie, 413 F.3d 1126 (10th Cir. 2005), the United States District Court for the District of Utah held that the services of a Navajo medicine man are recoverable funeral expenses under the MVRA.  See 317 F.Supp.2d at 1327.  The Honorable Paul G. Cassel, former United States District Judge for the

District of Utah,[6] noted that the victim's mother decided to seek the services of a medicine man after her son "asked her to make him feel better" and that she testified that the ceremony was connected to the burial service.  See United States v. Bedonie, 317 F.Supp.2d at 1327.   Judge Cassel held that the word "'funeral' is conventionally understood as including 'the observances held in honor or on behalf of one who has died.'" United States v. Bedonie, 317 F.Supp.2d at 1327-28 (quoting Webster's Third New International Dictionary 922 (1st ed. 1993)).   Judge Cassel stated that "a reasonable argument c[ould] be made that the services of a Native American medicine man are compensable as 'funeral' expenses."  United States v. Bedonie, 317 F.Supp.2d at 1328.  Judge Cassel further noted that the services of a medicine man "would appear to fit comfortably within th[e] concept of 'related services'" and that the term "related" is "typically interpreted broadly." United States v. Bedonie, 317 F.Supp.2d at 1328.  Judge Cassel held that, "[b]ecause the healing process is so subjective and personal," the defendant could not convincingly argue that the expenses were not "necessary" expenses and ordered that the defendant pay $3,140.00.  United States v. Bedonie, 317 F.Supp.2d at 1329.  In United States v. Sayetsitty, the United States Court of Appeals for the Ninth Circuit affirmed a restitution award to a deceased victim's mother under the VWPA for a "traditional Navajo burial ceremony" and noted that although the "expenses seem high . . . rites for the dead vary from religion to religion and place to place."  1999 WL 197246, at *3.  In United States v. Iron Cloud, the Eighth Circuit upheld a restitution order for a "giveaway ceremony," which "has its roots in indigenous social and religious rituals," and is meant to "honor persons in a traditional indigenous manner."  312 F.3d at 382-83.  In United States v. Iron Cloud, however, the

---

[6]Judge Cassell resigned from the bench in November 2007 and returned to teaching at the S.J. Quinney College of Law at the University of Utah.  See Paul G. Cassell, S.J. Quinney College of Law, http://www.law.utah.edu/faculty/faculty-profile/?id=paul-cassell (last visited January 7, 2012).

defendant did not challenge the amount of the $3,000.00 award.  See 312 F.3d at 382-83.

With respect to insurance, 18 U.S.C. § 3664(f)(1) provides that in "no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution."  18 U.S.C. § 3664(f)(1)(B).  Furthermore, 18 U.S.C. § 3664(j) provides that:

> **(1)**    If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation.

> **(2)**    Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in --

> > **(A)**    any Federal civil proceeding; and

> > **(B)**    any state civil proceeding, to the extent provided by the law of the State.

18 U.S.C. § 3664(j).  In United States v. Wooten, 377 F.3d 1134 (10th Cir. 2004), the United States Court of Appeals for the Tenth Circuit affirmed the award of $17,751.58 in restitution for the loss of two motor vehicles, all of which went to insurance companies.  See 377 F.3d at 1144.  In United States v. Crawford, 169 F.3d 590 (9th Cir. 1999), the Ninth Circuit affirmed the district court's restitution order under the VWPA and noted that

> there was no evidence establishing that the insurance proceeds received by the victim's family were intended to compensate for the funeral expenses, i.e., that the proceeds covered the 'same loss' as those covered in the restitution order.  Absent any showing that the civil proceeding resulted in compensation for the "same loss" under § 3664(j)(2), the district court was correct in its conclusion that there is no basis for reducing the disputed restitution order.

169 F.3d at 593 (footnotes omitted).  The district court, in United States v. Crawford, placed the

burden of establishing an offset on the defendant pursuant to 18 U.S.C. § 3664(e), which provides that the court shall determine who bears the burden of demonstrating matters other than loss or financial resources.  See 169 F.3d at 593 n.2.  In United States v. Serawop, the Tenth Circuit also held that the district court appropriately determined, under 18 U.S.C. § 3664(e), that the defendant bore the burden of establishing the amount of an offset.  See 505 F.3d at 1127 & 1128 nn.5-6. See also United states v. Sheinbaum, 136 F.3d 443, 449 (5th Cir. 1998)("Logically, the burden of proving an offset should lie with the defendant.").  In United States v. Francisco, No. 06-1015, 2008 WL 2367253 (D.N.M. Feb. 1, 2008)(Browning, J.), the Court held: "Regardless of the Yazzie's possible insurance recovery, however, Francisco continues to have an obligation to pay restitution." 2008 WL 2367253, at *10.

## ANALYSIS

The Court determines that, because Harwood did not commit a crime of violence, the VWPA, rather than the MVRA, applies to this case.  The Court will not exercise its discretion to award restitution for expenses related to James' services because the United States has not met its burden of establishing that those expenses are compensable under the VWPA.  Additionally, the Court will not exercise its discretion to award restitution for expenses related to the Geico Insurance settlement because the United States has not met its burden of establishing that those expenses are recoverable under the VWPA.  The Court will order Harwood to pay $5,500.00 in restitution to the Crime Victims Reparation Commission.

## I.    THE VWPA, RATHER THAN THE MVRA, APPLIES TO THIS CASE, BECAUSE INVOLUNTARY MANSLAUGHTER IS NOT A CRIME OF VIOLENCE.

Harwood pled guilty to the Indictment.  See Plea Agreement ¶ 3, at 2.  The Indictment charges:

> On or about March 16, 2007, in San Juan County, in Indian Country, in the District of New Mexico, the defendant, **HERBERT HARWOOD**, an Indian, unlawfully killed Richard King, while in the commission of an unlawful act not amounting to a felony, that is while operating a motor vehicle while under the influence of alcohol, contrary to N.M. Stat. Ann. § 66-8-102 (1978) and recklessly driving contrary to N.M. Stat. Ann. § 66-8-113 (1978), the defendant operated a motor vehicle without due caution and circumspection and with a <u>wanton and reckless</u> disregard for human life, and knew or should have know that his conduct imperiled the lives of others.

Indictment at 1 (emphasis added).  In the Plea Agreement, the "parties agree that, as part of the Defendant's sentence, the Court will enter an order of restitution pursuant to the Mandatory Victim's Restitution Act, 18 U.S.C. § 3663A."  Plea Agreement ¶ 6, at 3.  The PSR also recognizes that: "The Mandatory Victim Restitution Act of 1996 is applicable in this case."  PSR ¶ 29, at 7.  In his Second Objections, however, Harwood argues that the MVRA does not apply, because he has not pled to a crime of violence, offense against property, or crime related to tampering of consumer products.  <u>See</u> Second Objections ¶ 1, at 2.  He asserts that his involuntary manslaughter, pursuant to 18 U.S.C. § 1112, is not a crime of violence, because the mens rea attached is recklessness.  <u>See</u> Second Objections ¶ 1, at 2.  Accordingly, Harwood contends that the Court should determine the amount of restitution under 18 U.S.C. § 3663.

Section 16 of Title 18 of the United States Code defines the term "crime of violence" in two ways:

    **(a)**    an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

    **(b)**    any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16.  In <u>United States v. Lujan</u>, 9 F.3d 890 (10th Cir. 1993), the Tenth Circuit held that a manslaughter conviction was "clearly" a violent felony under the Armed Career Criminal Act, 18 U.S.C. § 924(e).  9 F.3d at 891.  In 2004, the Supreme Court of the United States held that 18 U.S.C.

§16 could not "be read to include petitioner's conviction for [driving under the influence] causing serious bodily injury under Florida law." Leocal v. Ashcroft, 543 U.S. at 11.  Noting that a crime of violence must be one that involves the "use . . . of physical force," the Supreme Court observed that "'use' requires active employment." Leocal v. Ashcroft, 543 U.S. at 9.  The Supreme Court cautioned that, although drunk driving is a "nationwide problem," that fact "does not warrant . . . shoehorning it into statutory sections where it does not fit." Leocal v. Ashcroft, 543 U.S. at 13.  In United States v. Bedonie, 413 F.3d 1126 (10th Cir. 2005), the Tenth Circuit noted that "it is not 'clear' whether involuntary manslaughter would even qualify as a crime of violence and trigger the provisions of the MVRA."  413 F.3d at 1130.  The Tenth Circuit stated that

> the Supreme Court's recent decision in Leocal v. Ashcroft, 543 U.S. 1 . . . (2004), where the [Supreme] Court held that driving under the influence of alcohol and causing serious bodily injury in an accident was not a crime of violence has called our decision in United States v. Lujan, 9 F.3d 890 (10th Cir. 1993), into serious question.

413 F.3d at 1130.  In 2008, the Tenth Circuit noted that a majority of the United States Courts of Appeals have held that crimes requiring only recklessness are not crimes of violence under 18 U.S.C. § 16 or U.S.S.G. § 2L1.2.  See United States v. Zuniga-Soto, 527 F.3d 1110, 1123-24 (10th Cir. 2008)(citing United States v. Torres-Villalobos, 487 F.3d 607, 616 (8th Cir. 2007); Fernandez-Ruiz v. Gonzales, 466 F.3d 1121, 1130 (9th Cir. 2006); Oyebanji v. Gonzales, 418 F.3d 260, 264-65 (3d Cir. 2005)(Alito, J.); Bejarano-Urrutia v. Gonzales, 413 F.3d 444, 4447 (4th Cir. 2005); Jobson v. Ashcroft, 326 F.3d 367, 372-76 (2d Cir. 2003); United States v. Chapa-Garza, 243 F.3d 921, 926 (5th Cir. 2001); Bazan-Reyes v. INS, 256 F.3d 600, 609-12 (7th Cir. 2001)).  The Tenth Circuit held

> In light of the persuasive reasoning of our sister circuits, we are convinced that recklessness falls into the category of accidental conduct that the Leocal Court described as failing to satisfy the use of physical force requirement under either of § 16's definitions of "crime of violence." See Leocal, 543 U.S. at 9 . . . .

United States v. Zuniga-Soto, 527 F.3d at 1124.

The Indictment reflects that the Harwood's offense was "wanton and reckless."  Indictment at 1.  Harwood's conduct violated 18 U.S.C. § 1112, which defines involuntary manslaughter as the unlawful killing of a human being without malice in "the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death."  18 U.S.C. § 1112(a).  To establish involuntary manslaughter beyond a reasonable doubt, the United States must "prove gross negligence amounting to wanton and reckless disregard for human life."  Tenth Circuit Pattern Jury Instructions Criminal 2.54.1, at 185 (2011).  The Tenth Circuit has noted that involuntary manslaughter is a homicide "without malice," because "the offender's mental state is not sufficiently culpable to meet the traditional malice requirements of an intentional or reckless killing."  United States v. Serawop, 410 F.3d 656, 666 n.7 (10th Cir. 2005).  The Tenth Circuit indicated that it has "consistently held that involuntary manslaughter requires only that 'defendant's acts must amount to gross negligence.'"  United States v. Serawop, 410 F.3d at 666 n.7 (citations omitted).  The MVRA applies only to those defendants convicted of: (i) a crime of violence, as defined in § 16; (ii) an offense against property; or (iii) an offense under § 1365, related to tampering with consumer products.  See 18 U.S.C. § 3663A(c)(1)(i)-(iii).

Involuntary manslaughter could conceivably be a crime of violence as defined in § 16.  The Supreme Court's dicta in Leocal v. Ashcroft, as well as the Tenth Circuit's holdings in United States v. Bedonie and United States v. Zuniga-Soto, foreclose this possibility, however.  In Leocal v. Ashcroft, the Supreme Court commented that "[i]n no 'ordinary or natural' sense can it be said that a person risks having to 'use' physical force against another person in the course of operating a vehicle while intoxicated and causing injury."  543 U.S. at 11.  The Supreme Court noted that the

-35-

"key phrase" in 18 U.S.C. § 16(a) -- "use . . . of physical force against the person or property of another" -- "most naturally suggests a higher degree of intent than negligent or merely accidental conduct." Leocal v. Ashcroft, 543 U.S. at 9. The Supreme Court went on to state that "we must give the language in § 16(b) an identical construction, requiring a higher mens rea than the merely accidental or negligent conduct involved in DUI offense." Leocal v. Ashcroft, 543 U.S. at 11. United States v. Bedonie called into question the MVRA's application to defendant's conviction for involuntary manslaughter in the wake of the Leocal v. Ashcroft decision. See 413 F.3d at 1130. Then, in United States v. Zuniga-Soto, the Tenth Circuit held that a mens rea of recklessness cannot satisfy §16's requirements for a crime of violence. See 527 F.3d at 1124. In United States v. Armijo, 651 F.3d 1226 (10th Cir. 2011), the Tenth Circuit held that a district court erred in counting Colorado's version of manslaughter as a crime of violence, because it involved only reckless conduct. See 651 F.3d at 1237. Here, involuntary manslaughter involves a mens rea less than recklessness -- gross negligence. See United States v. Serawop, 410 F.3d at 666 n.7. Accordingly, given the Tenth Circuit's doubts that involuntary manslaughter was a crime of violence after Leocal v. Ashcroft and its holding that a mens rea of recklessness addresses "accidental" conduct, such that it cannot be a crime of violence, the Court finds that involuntary manslaughter is not a crime of violence. Other federal courts have also held that involuntary manslaughter under 18 U.S.C. § 1112 is not a crime of violence. See Oyebanji v. Gonzales, 418 F.3d at 263-64 (holding that, under Leocal v. Ashcroft, vehicular homicide was not a crime of violence); Bejarano-Urrutia v. Gonzales, 413 F.3d at 447 (holding that involuntary manslaughter conviction resulting from automobile accident was not an aggravated felony because it was not a crime of violence under 18 U.S.C. § 16). Thus, ordinarily the MVRA does not apply to defendants convicted of involuntary manslaughter, such as Harwood.

-36-

Here, however, the parties agreed that the Court will enter an order of restitution pursuant to the MVRA.  See Plea Agreement ¶ 6, at 3.  The MVRA provides that, in "the case of a plea agreement that does not result in a conviction for an offense" described in 18 U.S.C. § 3663A(c)(1)(i)-(iii), the MVRA "shall apply only if the plea specifically states that an offense listed . . . gave rise to the plea agreement."  18 U.S.C. § 3663A(c)(2).  Harwood's Plea Agreement does not specifically state that one of the offenses listed in 18 U.S.C. § 3663A(c)(1)(i)-(iii) gave rise to the plea agreement.  The Court does not defer to a parties' stipulation as to the law.  See Prost v. Anderson, 636 F.3d 589, 596 n.13 (10th Cir 2011)("It is long settled that 'a party's position in case (even when that party is the United States) does not dictate the meaning of a federal statute.");  United States v. Tilga, No. 09-0865, 2011 WL 5535405, at *23 (D.N.M. Nov. 8, 2011)(Browning J.) ("Accordingly, rather than simply accept the parties' stipulated tax loss calculation, the Court will decide whether federal law permits defendants to claim the foreign tax credit post-indictment.").  Accordingly, the parties' stipulation in the Plea Agreement does not force the Court to apply the MVRA.  Because the MVRA does not apply to Harwood's offense, the Court will calculate restitution under the VWPA.

Under the VWPA, an order of restitution is within a district court's discretion and requires that a district court examine the defendant's financial resources.  See 18 U.S.C. § 3663(a)(1)(A), (a)(1)(B)(i)(II).  See also United States v. Quarrell, 310 F.3d at 677 ("Under the VWPA, the court has discretion to order restitution 'when sentencing a defendant convicted of an offense under this title . . . other than an offense described in section 3663A(c).").  With the exception of those two provisions, the "'provisions of the VWPA and MVRA are nearly identical in authorizing an award of restitution.'"  United States v. Serawop, 505 F.3d at 1118.  Accordingly, all the arguments from the evidentiary hearing regarding the MVRA apply with equal force to the Court's analysis of a

restitution calculation under the VWPA.

## II.   THE COURT WILL SUSTAIN THE OBJECTION TO THE $4,860.00 RESTITUTION CALCULATION FOR JAMES' SERVICES.

Harwood states that the burden is on the United States "to justify every penny of restitution claimed and ordered by the Court." First Objections ¶ 3, at 2. Harwood asserts that the more than $5,000.00 that the family is seeking for "Navajo healing ceremonies" is excessive, and "not an ordinary and reasonable expense for a funeral." First Objections ¶ 4, at 2. Harwood contends that no billing receipts explain these charges or what the billing rate was. See First Objections ¶ 4, at 2. Harwood first argues that the requested expense is not a necessary funeral or related service to King's death and burial. See Second Objections ¶ 6, at 4. Harwood asserts that Pete admitted that the healing ceremonies were not done as part of the funeral or for the benefit of King, and occurred approximately a year after the funeral. See Second Objections ¶ 7, at 4-5. He contends that restitution for these expenses should not be awarded, because: (i) the ceremonies were only for Pete's benefit; (ii) they were not done to honor or for the spiritual well-being of King; and (iii) the ceremonies cannot be analogized to "grief counseling." Second Objections ¶ 10, at 5. Harwood asserts that there is a lack of relationship between Pete's alleged injury and his wrongful conduct. See Second Objections ¶ 11, at 6. Harwood further contends that there is a lack of proof justifying the requested expense. See Second Objections ¶ 6, at 4. Harwood represents that James does not appear to be recognized by or known to the Navajo Nation Medicine Association. See Second Objections ¶ 6, at 4. Harwood argues that the sole basis for the $4,860.00 is an unsigned document which did not contain any of James' identifying information. See Second Objections ¶ 12, at 6. He asserts that the James Letter included in the First Addendum does not: (i) state what specific ceremonies were performed; (ii) state why those ceremonies were necessary; (iii) demonstrate that

-38-

James received that money or listed it as income on his taxes; or (iv) appear consistent with Pete's testimony.  <u>See</u> Second Objections ¶ 12, at 6-7.

At the hearing, Harwood argued that he was not sure under what theory the $4,860.00 was appropriate restitution.  <u>See</u> Tr. at 5:14-17 (Court, Butcher).  He contended that he does not believe that the cost of James' Navajo healing ceremony would be an appropriate funeral expense under 18 U.S.C. § 3663A(b)(3).  <u>See</u> Tr. at 5:18-23 (Butcher).  Harwood agreed that some of the fees the United States sought were appropriate and that he did not challenge Azzie's $150.00 fee.  <u>See</u> Tr. at 14:23-25 (Butcher).  Harwood stated that the Navajo equivalent of a preacher performing a service would be compensable.  <u>See</u> Tr. at 15:1-2 (Butcher).  Harwood argued that Pete's testimony makes clear that the ceremony which James provided was not a funeral or related expense, because it was not done for the benefit of King's spirituality or for that of the family in general.  <u>See</u> Tr. at 38:22-39:1 (Butcher).  Harwood argued that, under the MVRA, he must have proximately caused the reported expense for restitution to be appropriate.  <u>See</u> Tr. at 39:2-5 (Butcher).  He asserted that his problems with the restitution calculation include that: (i) King's death was not the proximate cause of Pete's injury; (ii) the charges for the ceremony were excessive; and (iii) the ceremony was not for the spirituality of King or of his immediate family, and did not take place at the time of the funeral.  <u>See</u> Tr. at 43:4-11 (Butcher).  The United States asserted that its interest is to ensure that Pete is fully compensated for her out-of-pocket expenses.  <u>See</u> Tr. at 9:17-24 (Nayback).  The United States argued that the restitution for the Navajo healing services would qualify under 18 U.S.C. § 3663A as a cost of necessary funeral and related services, because they were directly related to the death of her brother.  <u>See</u> Tr. at 10:16-19 (Nayback). The United States contended that King's death left Pete psychologically distraught, and that a funeral service is akin to a healing ceremony in that both bring closure and would fit under the statutory language of "related services."

Tr. at 10:21-11:1 (Nayback).  The United States asserted that it could not find any case law on point and that this might be a case of first impression for the Court.  See Tr. at 11:2-6 (Nayback).

Harwood challenges restitution for only one of the healing ceremonies in which Pete participated.  See Tr. at 14:23-25 (Butcher).  The burden is on the United States to establish "the amount of loss sustained by a victim as a result of the offense."  18 U.S.C. § 3664(e).  Upon examination, the Court has several concerns with respect to the $4,860.00 Pete seeks in restitution and will, in its discretion, decline to award restitution for this expense.  See United States v. Quarrell, 310 F.3d at 677 (noting that, under the VWPA, restitution is discretionary).

### A.   JAMES' SERVICES WERE NOT FUNERAL OR RELATED SERVICES UNDER § 3663(b)(3) OF THE VWPA.

The United States argued that restitution is appropriate for healing ceremony that James performed, because it is a necessary funeral or related service, and was directly related to the death of her brother.  See Tr. at 10:16-19 (Nayback).  The VWPA provides that, where an offense resulting in bodily injury also results in death, a court may order that the defendant "pay an amount equal to the cost of necessary funeral and related services."  18 U.S.C. § 3663(b)(3).  Several federal courts have recognized that restitution may be appropriate for expenses associated with traditional Native American ceremonies under 18 U.S.C. § 3663(b)(3).  See United States v. Sayetsitty 1999 WL 197246, at *3; United States v. Iron Cloud, 312 F.3d at 382-83; United States v. Bedonie, 317 F.Supp.2d at 1327-28.  In each of those cases, however, there was a connection between the ceremony performed and the deceased victim; the ceremony was either part of the burial of the deceased victim or designed to honor the deceased victim.  In United States v. Bedonie, Judge Cassell found that restitution for the services of a Navajo Medicine man was appropriate.  See 317 F.Supp.2d at 1327.  The deceased victim's mother explained that the medicine man's services were

connected with the burial service and that the medicine's man services are employed in the Navajo tradition as part of the healing process.  See United States v. Bedonie, 317 F.Supp.2d at 1327.  Judge Cassell noted that "a reasonable argument can be made that the services of a Native American medicine man are compensable as 'funeral' expenses, as the services would seem to be part of the observances held in honor of the deceased victim."  United States v. Bedonie, 317 F.Supp.2d at 1328 (emphasis added).  Judge Cassell further commented that the term "related" envisions "expenses for things that are not actually part of the funeral, but are connected to it."  United States v. Bedonie, 317 F.Supp.2d at 1328 (emphasis added).  In United States v. Iron Cloud, the victim's father testified that a "giveaway ceremony would be a memorial for his daughter to show how much she was loved and that its purpose was to 'help bury [his] daughter.'"  312 F.3d at 383 (emphasis added).  The Eighth Circuit further noted that several other sources described the purpose of a giveaway ceremony as honoring a deceased person in a "traditional indigenous manner."  United States v. Iron Cloud, 312 F.3d at 383 n.3 (citing A. Kehoe, The Giveaway Ceremony of Blackfoot and Plains Cree, 25 Plains Anthropologist 17, 17 (1980); G. Young & E. Gooding, Celebrations and Giveaways, 13 Handbook of North American Indians 1011, 1023 (W. Sturtevant et al eds., 2001); M. Brown & B. Desmond, Montana Tribal Courts: Influencing the Development of Contemporary Indian Law, 52 Mont. L. Rev. 211, 217 n. 20 (1991)).  In United States v. Sayetsitty, the Ninth Circuit found that the district court's restitution award for "a traditional Navajo burial ceremony" is a necessary funeral expense was not clearly erroneous.  1999 WL 197246, at *3.

Here, the healing ceremony did not commemorate King's life or honor his death, and was not part of any funeral or burial service.  Although Pete testified that the ceremony James performed was related to her brother's death, see Tr. at 22:3-5 (Nayback, Pete), she admitted that the ceremony was not part of King's funeral services and that she was the only family member who benefitted

from James' services.  <u>See</u> Tr. at 27:23-28:3 (Butcher, Pete).  Pete agreed that the ceremonies James

and Azzie performed were not for King, but for her.  <u>See</u> Tr. at 28:19-29:1 (Butcher, Pete).  Given

Pete's testimony, the expenses related to this healing ceremony cannot properly be termed "funeral

expenses."  The <u>New Oxford American Dictionary</u> defines a funeral as "the ceremonies honoring

a dead person."  <u>New Oxford American Dictionary</u> 704 (A. Stevenson & C. A. Lindberg eds, 3d.

2010).  <u>Black's Law Dictionary</u> defines a funeral expense as an "expense necessarily and reasonably

incurred in procuring the burial, cremation, or other disposition of a corpse, including the funeral

or other ceremonial rite, a casket and vault, a monument or tombstone, a burial plot and its care, and

a visitation (or wake)."  <u>Black's Law Dictionary</u> 659 (9th ed. 2009).  James' services were not

procured in relation to the burial or funeral, and were not sought until a year after King's death.

<u>See</u> Tr. at 27:17-22 (Butcher, Pete).  Additionally, the ceremony could not be analogized to a wake,

because Pete was the only family member who attended, and it appears that the ceremony focused

more on Pete than on King.  <u>See</u> Tr. at 28:19-29:1 (Butcher, Pete).  Accordingly, if restitution for

these expenses is appropriate under 18 U.S.C. § 3663(b)(3), the Court must find that they are

"related services."  18 U.S.C. § 3663(b)(3).

The phrase "necessary funeral and related services" suggests that any services beyond the

funeral for which a victim seeks restitution must be related to the funeral or burial.  In <u>United States</u>

<u>v. Bedonie</u>, Judge Cassel found that phrase "related services" envisions "expenses for things that

are not actually part of the funeral, but are connected to it."  317 F.Supp.2d at 1328.  The Court

cannot say that the healing ceremony Pete paid for was related to her brother's funeral.  The United

States argued that James' services fell under "necessary funeral and related services," because it was

related to her brother's death.  Tr. at 10:16-19 (Nayback).  This connection is not enough.  Although

"related services" broadens the scope of recoverable expenses beyond the actual funeral, the

expenses must still be related to the funeral rather than just the death.  If related services encompassed any services related to a victim's death, then § 3663(b)(3) would become a mechanism for recovering a broad swath of expenses.  For example, if a victim's family held a memorial to commemorate the date of the victim's death every year, the victim's family could conceivably, under the United States' argument, recover for that event every year until the defendant's sentencing.  Furthermore, to give the phrase "related services" such an expensive meaning and remove the word "funeral" as a limiting clause, would be inconsistent with how "related services" has been defined in other statutory contexts.  The Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 to 1485 ("IDEA"), also has a related-services provision.  Under the IDEA, free appropriate public education includes "special education and related services."  20 U.S.C. §§ 1401(18), 1412.  The statute defines "related services" as supportive services "as may be required to assist a child with a disability to benefit from special education."  20 U.S.C. § 1401(26)(A).  Similarly, related services in the context of "necessary funeral and related services" should be construed to include services which are connected with the funeral service, either through common purpose -- such as commemorating the life of the victim or addressing the spiritual salvation of the deceased -- or temporally, such that the connection between the two events is obvious.

Pete testified that: (i) the ceremony James performed took place more than a year after her brother's death, see Tr. at 27:17-22 (Butcher, Pete); and (ii) the ceremony only benefitted her -- no other family members attended the ceremony -- and it was not for King, see Tr. at 28:19-29:1 (Butcher, Pete).  Given these facts, the Court cannot say that James' services were "necessary funeral and related services," and declines to order restitution for these expenses under § 3663(b)(3). Furthermore, the Court notes that it is the United States' burden to establish the amount of loss sustained.  See 18 U.S.C. § 3663(e).  The Court finds that the United States has not provided

-43-

sufficient evidence to justify the Court finding that this ceremony was a "related" service. The United States did not present any evidence regarding the traditional purpose of the healing ceremony and whether it ordinarily is used when grieving for a family member. Pete's description of the ceremony, as a personal healing for her to alleviate the cold she felt, and that the ceremony occurred a year later, makes the expenses incurred here seem vastly different from the restitution ordered in other cases. Because of the marked differences between the circumstances before the Court and the other restitution cases addressing traditional Native American ceremonies, more was needed on the United States' part to show that this ceremony fell within the scope of § 3663(b)(3).

### B. JAMES' SERVICES ARE NOT NECESSARY MEDICAL AND RELATED PROFESSIONAL SERVICES UNDER § 3663(b)(2)(A) OF THE VWPA.

At the hearing, Harwood asserted that, if these restitution claims are for psychological care or grief counseling, then the defense would be entitled to view James' resume. See Tr. at 6:18-21 (Butcher). He contended that Pete testifying to what James' did and how much she paid him would not be sufficient to establish her claim for restitution. See Tr. at 6:22-7:2 (Butcher). He further argued that he is entitled to know the background of the person performing the ceremony, details about how many hours he worked, and the details of the services he performed. See Tr. at 7:2-5 (Butcher). The Court stated that § 3663A(b)(2)(A) seems to have a broad definition of services, which includes "the cost of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care." Tr. at 39:12-19 (Court). The Court stated that the provision did not appear to be limited to medical care. See Tr. at 39:20-22 (Court). Harwood admitted that the provision could be broadly read, but stated that there was a more fundamental issue of proximate cause. See Tr. at 39:23-40:1 (Butcher). The Court also noted that there are cases where counseling expenses are awarded as restitution, pointing to United States v. Fisher, and

-44-

United States v. Oslund.  See Tr. at 46:16-47:14 (Court, Butcher).

In his Second Objections, Harwood represents that, since James was identified as a Navajo

medicine man living in Arizona, the Navajo Nation Medicine Man Association has indicated that

there is no record of him as a medicine man for the Navajo Nation.  See Second Objections ¶ 15,

at 7.  Harwood argues that, because "no details of Mr. James' history was provided either before or

at the hearing and there is no proof of his existence, much less his credentials, there is a lack of

evidence to show that Mr. James' ceremonies" are a recognized method of healing.   Second

Objections ¶ 15, at 7.  Harwood asserts that fake healers plague the Navajo Nation.  See Second

Objections ¶ 15, at 8 (citing Donovan, supra).  The United States did not file a written response to

the Second Objections and, at the hearing, did not argue that James' services would fall under a

provision other than § 3663A(b)(3) or § 3663(b)(3).

Section 3663(b)(2) provides:

in the case of an offense resulting in bodily injury to a victim including an offense
under chapter 109A or chapter 110 --

(A)     pay an amount equal to the cost of necessary medical and related
professional services and devices relating to physical, psychiatric,
and psychological care, including nonmedical care and treatment
rendered in accordance with a method of healing recognized by the
law of the place of treatment . . . .

18 U.S.C. § 3663(b)(2)(A).  No federal court appears to have analyzed what the phrase "in

accordance with a method of healing recognized by the law of the place of treatment" requires the

United States or a victim to establish.  Harwood argues that this provision entitles him to some basic

information about James to determine whether his services would qualify as treatment rendered in

accordance with a method of healing recognized in the Navajo Nation.  See Second Objections ¶ 15,

at 7-8.  In support of the restitution calculation, Pete submitted an unsigned letter from James that

did not include any contact information.  See James Letter at 15.  The Tenth Circuit has held that a district court must support its restitution order with findings of fact in the record.  See United States v. Reano, 298 F.3d 1208, 1210-11 (10th Cir. 2002).  More specifically, in United States v. Brown, 247 F.App'x 992 (10th Cir. 2007)(unpublished), the Tenth Circuit vacated a portion of a restitution order, because the district court did not make specific findings of fact in the record  to support restitution under § 3663A(b)(2).  See 247 F.App'x at 993-94.  In the absence of any argument from the United States regarding this provision or any specific information about James, the Court cannot, on a sound basis, find that the United States has satisfied its burden of establishing that this expense qualifies for restitution under § 3663(b)(2).  See United States v. Hudson, 483 F.3d 707, 710 (10th Cir. 2007)(stating that the United States bears the burden of proving loss).  The Court has no information from which to conclude that James' services were in accordance with a method of healing recognized "by the law of the place of treatment."  To make a factual finding that James' services qualify for restitution under §3663(b)(2), the Court agrees that it would need to see James' resume to determine that he was qualified to provide the services rendered and information regarding the ceremonies performed -- what Native Americans consider their purpose, what the ceremonies are designed to do, and what the medicine man does -- to determine that the ceremonies fall within professional services "relating to physical, psychiatric, and psychological care" recognized within the Navajo Nation.  18 U.S.C. § 3663(b)(2).  Without any information regarding the purpose of the ceremony, James' qualifications, or how such ceremonies fit within the Navajo tradition, the Court does not have a sound basis on which to base its findings in support of restitution.  Accordingly, the Court will decline to exercise its discretion to award Pete restitution for James' services.

Moreover, it is unclear whether Pete qualifies under this provision because she did not

personally suffer bodily harm.  Several United States Courts of Appeals have held that, unless the victim was personally injured, psychological and other services are not recoverable under § 3663(b)(2)(A) or the analogous provision in the MVRA, § 3663A(b)(2)(A).  In <u>United States v. Hicks</u>, 997 F.2d 594 (9th Cir. 1993), a defendant challenged the inclusion of psychological counseling for an Internal Revenue System ("IRS") employee in the restitution order.  997 F.2d at 600.  The Ninth Circuit noted that "section 3663 specifically authorizes the inclusion of the cost of counseling <u>only</u> where the victim has suffered a <u>physical</u> injury in addition to the emotional injury giving rise to the need for counseling."  <u>United States v. Hicks</u>, 997 F.2d at 600 (emphasis original). The Ninth Circuit held that the "cost of psychological counseling can be included in a restitution order only when the victim has suffered physical injury" and vacated the award of restitution for psychological services because the IRS employee suffered no physical injury.  <u>United States v. Hicks</u>, 997 F.2d at 601-02.  In <u>United States v. Dayea</u>, 73 F.3d 229 (9th Cir. 1995), the Ninth Circuit reiterated that "[s]ection 3663(b)(2) limits its own application to cases in which the offense caused bodily injury to 'a victim.'" 73 F.3d at 231.  In that case, the Ninth Circuit was addressing another provision of § 3663, which provides that a court may order restitution to reimburse "the victim" for income the victim lost as a result of the offense.  <u>United States v. Dayea</u>, 73 F.3d at 231 (citing 18 U.S.C. § 3663(b)(2)(C)).  It held that, "to be eligible for lost income compensation under § 3663(b)(2), a victim must personally suffer bodily injury." <u>United States v. Dayea</u>, 73 F.3d at 231. In <u>United States v. Reichow</u>, 416 F.3d 802 (8th Cir. 2005), the defendant challenged restitution for bank employees' psychological treatment following a bank robbery.  <u>See</u> 416 F.3d at 805.  The Eighth Circuit found that his argument had merit and held that "the MVRA requires evidence of bodily injury to victims before restitution can be ordered for their psychological treatment expenses."  <u>United States v. Reichow</u>, 416 F.3d at 805.  The Eighth Circuit held that the "plain

-47-

language § 3663(b)(2)(A) authorizes restitution for professional services for psychiatric and psychological services in cases where the offense results in bodily injury to a victim." United States v. Reichow, 416 F.3d at 806.  In a per curiam decision, the United States Court of Appeals for the Fourth Circuit also held that section § 3663A(b)(2) "requires proof of bodily injury to a victim before a court may order restitution for counseling" and reversed the restitution order because the victims did not suffer a bodily injury.  United States v. Manna, 201 F.App'x 146, 148 (4th Cir. 2006)(unpublished)(per curiam)(before Wilkinson, J., Williams, J., and King, J.).  The Tenth Circuit has not decided this issue; however, in United States v. Dotson, 242 F.3d 291, 2000 WL 1820375 (10th Cir. 2000)(unpublished table decision), the Tenth Circuit noted that "it appears that every federal court to consider the issues has determined restitution cannot be ordered under VWPA for lost income and emotional damages unless the victim suffered bodily, i.e., physical harm."  2000 WL 1820375, at *5 (citing United States v. Dayea, 73 F.3d at 231; United States v. Sharp, 927 F.2d 170, 174 (4th Cir. 1991)).  The Tenth Circuit declined to reach the issue "whether an award of restitution for lost income and medical expenses can be predicated on a victim's mental injuries alone," but found that the statute is ambiguous with regard to the scope of the phrase "bodily injury" and the district court award was not "plainly erroneous."  United States v. Dotson, 2000 WL 1820375, at *5.  It noted that "the results reached in other Circuits interpreting the phrase 'bodily injury' in § 3663(b)(2) are by no means conclusive" and that federal law "deems mental injury to constitute bodily injury in other contexts."  United States v. Dotson, 2000 WL 1820375, at *5.

The Court agrees with the other federal courts that an award cannot be predicated on a victim's mental anguish alone.  See United States v. Reichow, 416 F.3d at 806 ("The plain language of § 3663(b)(2)(A) authorizes restitution for professional services for psychiatric and psychological care in cases where the offense results in bodily injury to a victim.  The statute does not provide for

such an order in the absence of bodily injury."). The statute's plain language of the statute supports this interpretation and confines the scope of restitution for psychological services to when the victim has suffered a "bodily injury." Pete did not suffer any physical injuries as a result of Harwood's offense. She asserts that she touched her brother's body before his burial and that this contact resulted in a "coldness" in her hands, which spread to the rest of her body. Tr. at 54:9-11 (Pete). The United States has not argued that Pete's injuries would be compensable under § 3663(b)(2)(A) and, in the absence of such argument, the Court finds that there is no basis to distinguish this case from cases in other Circuits, which have required that a victim suffer bodily injury for psychological services to be recoverable. In any case, the Court finds that the United States has not provided sufficient information for the Court to conclude that this treatment was "rendered in accordance with a method of healing recognized by the law of the place of treatment." 18 U.S.C. § 3663(b)(2)(A). Accordingly, the Court declines to exercise its discretion to award restitution for the expenses associated with James' services.[7]

## III.  THE COURT WILL SUSTAIN HARWOOD'S OBJECTION TO RESTITUTION BASED ON THE GEICO SETTLEMENT.

Harwood expresses concern that the restitution calculation includes double counting, because it "would seem funeral expenses are a reasonable and ordinary expense of the decedent's estate," and Geico Insurance paid $25,000.00 to King's estate. First Objections ¶ 5, at 3. Harwood "specifically objects to the claim of $25,000.00 concerning the Geico settlement" because it is the United States' burden to show that such a claim is appropriate. First Objections ¶ 6, at 3. Harwood

---

[7]Because the Court will not order Harwood to pay restitution for James' services, a second evidentiary hearing to present evidence that James is not a member of the Navajo Nation Medicine Man Association is not necessary. Accordingly, the Court will deny Harwood's request for a second evidentiary hearing.

also objects to including the Geico Insurance settlement because the settlement of King's estate includes $9,037.25 in attorneys' fees which are outside the scope of the federal restitution statutes. See First Objections ¶ 7, at 3.  He further asserts that there is no showing that the remaining amount of the settlement is going towards appropriate expenses.  See First Objections ¶ 7, at 4.  He argues that the settlement award also includes other barred expenses, such as pain and suffering and loss of consortium or other emotional support.  See First Objections ¶ 7, at 4.  Harwood argued that restitution for the Geico Insurance money is not appropriate under § 3663A, because Geico Insurance tendered the policy limits without any determination of what the money was for and that a third of that insurance money went towards attorneys' fees.  See Tr. at 7:25-8:5 (Butcher).  The United States represented that insurance companies are entitled to restitution in the event that they have to pay for a wrongful death.  See Tr. at 12:15-18 (Nayback).  The United States asserted that the insurance settlement did not go to Pete, but is being held in trust for King's two children.  See Tr. at 12:18-21 (Nayback).  It conceded that any portion of the settlement that went towards attorneys' fees is not compensable.  See Tr. at 12:22-13:1 (Nayback).  The United States noted, however, that Harwood did not cite any legal authority for the proposition that attorneys' fees are not compensable.  See Tr. at 36:11-12 (Nayback).  Harwood further asserted that, because the estate was paid the $25,000.00, the funeral expenses should have been paid from the estate.  See Tr. at 37:16-18 (Butcher).

    In his Second Objections, Harwood asserts that, should the Court find that he should reimburse Geico Insurance for all or part of the $25,000.00 to King's estate, then there was a duty to mitigate the funeral costs with money from the estate to avoid double compensation.  See Second Objections at 1.  Harwood argues that § 3663 does not allow for reimbursement of insurance paid or attorneys' fees.  See Second Objections ¶ 16, at 8.  Harwood asserts that insurance settlements

should be used to offset a defendant's restitution.  See Second Objections ¶ 16, at 8 (citing 18 U.S.C. § 3664(j)).  Harwood contends that, because he stands in the insured's shoes, Geico Insurance cannot seek restitution from him.  See Second Objections ¶ 17, at 8.  Harwood further argues that Geico Insurance did no more than tender the policy limits to King's estate without any finding of for what the money was to be used.  See Second Objections ¶ 18, at 8-9.  He argues that, ultimately, the settlement funds did not go towards any § 3663 expense, and were "divided between the lawyers and [King's] children."  Second Objections ¶ 19, at 9.

Neither the United States nor the USPO indicated under what provision of the MVRA or the VWPA the Geico Insurance settlement would be recoverable.  The United States asserted that the Geico Insurance settlement is for wrongful death and that, as such, it was compensable under the VWPA.  See Tr. at 12:15-18 (Nayback).  The Court has found no cases indicating that wrongful death insurance payments are recoverable.  The First Addendum characterizes the Geico settlement only as a "Wrongful Death Settlement issued by Geico Insurance Company in the amount of $25,000."  First Addendum at 3.  Portions of the settlement may be compensable under the VWPA, if, for example, they were for funeral and related expenses, under § 3663(b)(3), or as reimbursement for lost future income, under § 3663(b)(2)(C); however, it is not clear to the Court that the Geico Insurance payment was made for such a purpose.  The First Addendum indicates that the settlement money is currently being held in trust for King's children.  See First Addendum at 3.  Because the funds remain in a trust, and were not spent on the funeral or other expenses, it appears that the funds are not appropriate restitution under § 3663(b)(3).  Additionally, because the funds remain in trust and there is no evidence that psychological, rehabilitative or other related services have been used, the Geico Insurance settlement does not appear to be appropriate restitution under § 3663(b)(2)(A) or (B).  Geico Insurance would not be providing payment for lost income or expenses related to

participation in the investigation or prosecution of the offense, such that restitution would be appropriate under § 3663(b)(4). Because King did not suffer property damages in the course of Harwood's offense, the Geico Insurance settlement cannot be appropriate restitution under § 3663(b)(1). Although the Geico Insurance payment may have included in it compensation for lost future income, which would be appropriate for restitution under § 3663(b)(2)(C), the Court has no information about how King was employed or his income. Furthermore, the Court has no information that the Geico Insurance settlement was intended to compensate the family for this loss. The VWPA does not appear to contemplate restitution for "wrongful death," most likely because that wrong is a civil claim to be pursued separately. The burden is on the United States to establish the amount of loss. See 18 U.S.C. § 3664(e). See also United States v. Sundstrom, 2000 WL 1005267, at *2. The United States made no arguments with respect to the Geico Insurance settlement other than: (i) characterizing this settlement as for wrongful death; (ii) representing that insurance companies are entitled to restitution; and (iii) conceding that the attorneys' fees are not appropriate for restitution. See Tr. at 7:25-8:5 (Nayback); Tr. at 37:16-18 (Nayback). Although the United States is correct in stating that insurance companies may receive restitution for expenses it paid, see United States v. Wooten, 377 F.3d at 1144, those expenses must still be appropriate for restitution under the VWPA. See United States v. Gordon, 480 F.3d at 1210. The only information that the Court has regarding the Geico Insurance settlement indicates that the payment was for "wrongful death," First Addendum at 3, which does not appear to fit within the VWPA framework. The Court cannot say that the Geico Insurance settlement is recoverable under the VWPA and the United States has not argued under what provision it believes the insurance payment is recoverable. Accordingly, the Court will not exercise its discretion to order Harwood to pay restitution for the Geico Insurance settlement.

IV.    **THE COURT ORDERS THAT HARWOOD PAY $6,340.00 IN RESTITUTION.**

At the hearing, Harwood did not object to the Crime Victims Reparation Commission or healing services of Azzie being included in the restitution calculation.  See Tr. at 14:23-25 (Butcher).  Harwood stated that he would be willing to pay restitution in the amount of $6,340.00 for the funeral expenses and would not seek any offset for the more than $1,500.00 in donations that the family received.  See Tr. at 7:11-16 (Butcher).  The United States represented that Pete kept detailed records about donations from other members of the community and that they were appropriately deducted from the total restitution amount.  See Tr. at 11:21-12:1 (Nayback).  In his Second Objections, Harwood maintains that, if the Court does not order him to pay restitution which includes the settlement or Pete's healing service, he is willing to pay $6,340.00 in total restitution.  See Second Objections ¶ 21, at 10.

In calculating the restitution owed to the family, the First Addendum indicates that the total funeral costs were $6,340.00.  See First Addendum at 2.  Section 3664(j) indicates that, when a victim has received compensation from another source, a court "shall order that restitution be paid to the person who provided or is obligated to provide compensation."  18 U.S.C. § 3664(j)(1).  The Crime Victims Reparation Commission paid $5,500.00 to offset the funeral costs so that amount is subtracted from the total.  See First Addendum at 4.  This calculation leaves $840.00 owed to the family.  The First Addendum also subtracted the $1,502.06 in donations that the family received, see First Addendum at 2, and the United States asserted that this was appropriate at the hearing, see Tr. at 11:21-12:1 (Nayback).  Harwood, however, repeatedly stated in his briefings and at the hearing that, if the Court did not award the healing expenses or Geico Insurance settlement as restitution he would not seek an offset for the donations King's family received.  See Second Objections at 1, 10; Tr. at 7:11-16 (Butcher); id. at 8:6-8 (Butcher); id. at 46:9-10 (Butcher).  The

-53-

Court adopt Harwood's representations at the hearing that he would waive an offset if the Court did not order him to pay restitution for the healing ceremonies or for the Geico Insurance settlement, and so will not deduct the $1,502.06 from the remaining amount owed to Pete.  The Court will therefore order Harwood to pay Pete $840.00.  Harwood shall pay this amount to Pete, in accordance with § 3664(j)(1), before any amount is paid to the Crime Victims Reparation Commission.  The Crime Victims Reparation Commission is also entitled to receive restitution for the $5,500.00 that it contributed to help pay for the funeral and related expenses under § 3663(b)(3) and § 3664(j)(1). Harwood has not contested restitution for the Crime Victims Reparation Commission.  The Court will therefore order that Harwood pay the Crime Victims Reparation Commission in Albuquerque, New Mexico $5,500.00.

Harwood does not object to paying $6,340.00 in restitution.  At the hearing, Harwood asserted that he believed $6,340.00 is a reasonable outcome and one contemplated under the statute. See Tr. at 8:6-8 (Butcher).  Because Harwood has offered this amount as a reasonable compromise and has waived any right he had to have the full amount of funeral expenses offset, the Court finds that such an award is warranted and will exercise its discretion to award $6,340.00 in restitution. Harwood will pay $840.00 of that amount to Pete and $5,500.00 of that amount to the Crime Victims Reparation Commission.

**IT IS ORDERED** that the Defendant's: (i) Objections to Restitution, filed August 24, 2011 (Doc. 29), are sustained; and (ii) Objections to the Request for Restitution and Memorandum in Support, filed November 1, 2011 (Doc. 35), are sustained.  The Court will order that Harwood pay $840.00 to Karen Pete, the representative of King's estate, and $5,500.00 to the Crime Victims Reparation Committee in Albuquerque, New Mexico.  The Court orders that Harwood shall pay Pete before making restitution to the Crime Victims Reparation Commission.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
  United States Attorney
Kyle T. Nayback
  Assistant United States Attorney
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

John V. Butcher
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

     *Attorneys for the Defendant*